UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Petition of | Case No: 1:21-mc-00007 |
| THE FEDERAL REPUBLIC OF NIGERIA, | |
| Applicant, | |
| For an order pursuant to 28 U.S.C. § 1782 permitting Applicant to issue subpoenas in aid of foreign proceedings to: | |
| VR ADVISORY SERVICES, LTD., VR ADVISORY SERVICES (USA) LLC, VR GLOBAL ONSHORE FUND, L.P., VR ARGENTINA RECOVERY ONSHORE FUND II, L.P., JEFFREY JOHNSON, and ASHOK RAJU, | |
| Respondents. | |

---

**MEMORANDUM OF LAW
IN SUPPORT OF APPLICANT'S 28 U.S.C. § 1782 PETITION**

---

**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500

*Attorneys for Applicant The Federal
Republic of Nigeria*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 5

    I.     The Gas Supply and Processing Agreement (GSPA) .................................... 5

    II.    The Arbitration ................................................................................................ 5

    III.   The English Proceedings ................................................................................. 6

    IV.   P&ID's Lobbying in the United State .............................................................. 7

    V.    Prior Section 1782 Applications .................................................................... 9

        A.  Criminal Investigations in Nigeria ......................................................... 9

        B.  Bank Application .................................................................................... 10

        C.  Prior Application .................................................................................... 14

ARGUMENT ...................................................................................................................... 18

   A.  The Application Meets the Statutory Requirements of Section 1782(a) ......................... 18

      1.  VR Respondents are Found in This District ......................................................... 18

      2.  The Discovery Nigeria Seeks is "For Use" in a Foreign Tribunal ...................... 19

      3.  Nigeria is an Interested Party ............................................................................... 20

   B.  The Discretionary Factors Weigh In Favor Of Nigeria .................................................. 21

      1.  VR Respondents are Not Within the Jurisdiction Of The English Courts .......... 21

      2.  The English Courts Are Receptive To Section 1782 Discovery ......................... 23

      3.  The Application Does Not Circumvent English Proof-Gathering Restrictions .. 23

      4.  The Discovery Requested Is Not Unduly Burdensome ...................................... 24

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*In re Accent Delight International Ltd.*,
   869 F.3d 121 (2d Cir. 2017) ............................................................................2, 10, 19

*In re Accent Delight International Ltd.*,
   791 Fed.Appx. 247 (2d Cir. 2019) ................................................................................23

*In re Application of Consellior SAS*,
   2017 WL 449770 (S.D.N.Y., Feb. 2, 2017) ..................................................................22

*In re Application of Esses*,
   101 F.3d 873 (2d Cir. 1996) ........................................................................................21

*In re Catalyst Managerial Services, DMCC*,
   680 Fed.Appx.37 (2d Cir. 2017) ..................................................................................19

*In re Edelman*,
   295 F.3d 171 (2d Cir. 2002) ..................................................................................18, 21

*In re Euromepa S.A.*,
   51 F.3d 1095 (2d Cir. 1995) ..................................................................................23, 24

*Federal Republic of Nigeria v. VR Advisory Services, Ltd.*,
   2020 WL 6547902 (S.D.N.Y. Nov. 6, 2020) ................................................................1

*In re Gorosan Limited*,
   435 F.Supp.3d 589 (S.D.N.Y. 2020) ............................................................................20

*In re Hansainvest Hanseatische Investment-GmbH*,
   364 F.Supp.2d 243 (S.D.N.Y. 2018) ............................................................................23

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ...............................................................................................*Passim*

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
   895 F.3d 238 (2d Cir. 2018) ........................................................................................22

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ............................................................. 23, 24

*Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*,
   962 F.3d 576 (D.C. Cir. 2020) ................................................................. 7

*Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*,
   2020 WL 7122896 (D.D.C. Dec. 4, 2020) ................................................. 7

*In re Republic of Kazakhstan*,
   110 F.Supp.3d 512 (S.D.N.Y. 2015) ...................................................... 20

*In re Top Matrix Holdings*,
   2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ............................................. 22

*Union Fenosa Gas, S.A. v. Depository Trust Company*,
   2020 WL 2793055 (S.D.N.Y. May 29, 2020) .......................................... 19

*In re Warren*,
   2020 WL 6162214 (S.D.N.Y. Oct. 21, 2020) .......................................... 22

**Statutes**

28 U.S.C. § 1782 ............................................................... *Passim*

**Rules**

Federal Rules of Civil Procedure 26 .......................................... 1

Federal Rules of Civil Procedure 45 .......................................... 1

Applicant the Federal Republic of Nigeria ("Nigeria") respectfully submits this memorandum of law in support of its request pursuant to 28 U.S.C. §1782(a) ("Section 1782") and Rules 26 and 45 of the Federal Rules of Civil Procedure (the "Federal Rules") to conduct discovery in this district from respondents VR Advisory Services, Ltd. ("VR Advisory"), VR Advisory Services (USA) LLC, VR Global Onshore Fund, L.P., VR Argentina Recovery Onshore Fund II L.P., Jeffrey Johnson, and Ashok Raju (collectively "VR Respondents") for use in civil proceedings in London, England  (the "Application").

## PRELIMINARY STATEMENT

Nigeria notes that it previously applied for discovery under Section 1782 from VR Respondents for discovery in aid of criminal investigations and prosecutions in Nigeria (the "Nigerian Proceedings"), *Federal Republic of Nigeria et al. v. VR Advisory Services, Ltd. et al.*, 1:20-mc-00209 (PAE) (the "Prior Application").  On November 6, 2020, the Court (Engelmayer, J.) granted VR Respondents' motion to vacate the Court's prior order granting the Prior Application on the basis that Nigeria's request for discovery in aid of criminal proceedings should be channeled through the Department of Justice ("DOJ") pursuant to Nigeria's Mutual Legal Assistance Treaty with the United States ("MLAT").[1]  *See Federal Republic of Nigeria v. VR Advisory Services, Ltd.*, 2020 WL 6547902 (S.D.N.Y. Nov. 6, 2020), hereinafter the "Vacate Order."  The Vacate Order is currently on appeal with the Second Circuit, *Federal Republic of Nigeria et al. v. VR Advisory Services, Ltd. et al.*, 20-3908.

In this Application, Nigeria seeks discovery from VR Respondents in aid of foreign civil proceedings pending in London, England to set aside fraudulent arbitration awards (the "Awards") made in favor of non-party Process & Industrial Developments Limited ("P&ID") against Nigeria

---

[1] The Prior Application for discovery in aid of the Nigerian Proceedings was made by Nigeria and its Attorney General, the Honorable Abubakar Malami.  Attorney General Malami is not a party to this Application.

in connection with a sham natural gas processing agreement, the Gas Supply and Processing Agreement ("GSPA").[2]  Even with the Vacate Order, this Application should be granted because the MLAT process is irrelevant to Nigeria's request for discovery in aid of civil proceedings.

While discovery obtained under Section 1782 for use in one foreign proceeding can usually be utilized in another foreign proceeding, *In re Accent Delight International Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017), in light of the Vacate Order Nigeria is prohibited from using discovery from this Application in the Nigerian Proceedings.  Any discovery obtained will only be delivered to Nigeria's English solicitors and barristers who are litigating the civil proceeding in England.[3]

Entered into in January 2010, the twenty-year term GSPA obligated P&ID to construct and operate a natural gas processing plant in Nigeria.[4]  P&ID never had the infrastructure or ability to perform the GSPA, and P&ID never intended to perform the GSPA.[5]  Instead, P&ID bribed former Nigerian officials to secure the GSPA, manufactured a default, and despite having made no effort to perform the GSPA, in 2012 P&ID commenced arbitration proceedings in London, England against Nigeria (the "Arbitration") claiming circa $6 billion of "lost profits."[6]

P&ID built its case on fabricated evidence and perjured testimony from P&ID's co-founder Michael Quinn (deceased) and continued bribing of corrupted Nigerian officials to cause Nigeria to put forth a weak defense.  P&ID's fraud during the Arbitration was not known at the time, and

---

[2] The English proceedings that are the subject of the Application are: (1) *In re an Arbitration Claim and In the Matter of Applications Under S.67 and S.68 of the Arbitration Act 1996 Between: The Federal Republic of Nigeria and Process & Industrial Developments Limited*, Claim No. CL-2019-000752 (the "Set Aside Proceeding"); and (2) *In re an Arbitration Claim and In the Matter of an Application Under S.66 of the Arbitration Act 1996 Between: Process & Industrial Developments Limited and The Federal Republic of Nigeria*, Claim No. CL-2018-000182 ("Enforcement Proceeding" and together with the Set Aside Application, the "English Proceedings"). *See* Declaration of Shaistah Akhtar ("Akhtar Decl.") Akhtar Decl.at ¶6.  A true and correct copy of the GSPA is attached as Exhibit 1 to the Declaration of Alexander D. Pencu ("Pencu Decl.").

[3] *See* Akhtar Decl., at ¶29.

[4] *See* Akhtar Decl. Ex. B, at ¶¶20-21; *See* Pencu Decl. Ex. 1, at Section 2.

[5] *See* Akhtar Decl. Ex. B, at ¶¶200-210.

[6] *See* Akhtar Decl. Ex. B, at ¶¶27-28; *see also* Akhtar Decl., at ¶¶4-5.

in 2017 the arbitration tribunal (the "Tribunal") awarded P&ID $6.6 billion (the "Final Award"). The Final Award is now more than $10 billion with interest.[7]   To put the Final Award in context, $10 billion is more than a quarter of Nigeria's national gross foreign reserves, and is almost double Nigeria's national budget for education, health and counterterrorism combined.[8]

By contrast, P&ID is a BVI shell entity founded by Irish arms dealers whose associates have been imprisoned in the United Kingdom for illegally trafficking "40,000 AK-47 assault rifles, 30,000 rifles, 10,000 pistols and 32 million rounds of ammunition" from China to Nigeria – a transaction facilitated by P&ID's co-founder Brendan Cahill, who "was reported to be acting for the Nigerian purchaser in the transaction."[9]   Now that it is controlled by VR Advisory, P&ID feebly attempts to distance Cahill from P&ID.  P&ID was a two-man operation (Quinn and Cahill), and P&ID fraudulently procured the GSPA and Awards with Cahill at the helm. In 2017, Respondent VR Advisory acquired 25% of P&ID[10] rather than simply buying the Final Award in an attempt to evade England's strong prohibitions against champerty.  VR Advisory is funding P&ID's efforts to enforce the fraudulent Final Award and lobby the United States government.[11] VR Advisory stepped into the shoes of P&ID, and is tarred by Quinn and Cahill's illegal conduct.

P&ID's effort to enforce the fraudulent Final Award against Nigeria hit a major stumbling block in England this year, when on September 4, 2020, the English court found that Nigeria established a strong *prima facie* case of fraud against P&ID, and granted Nigeria permission to challenge the Final Award in a trial on Nigeria's application to set aside the Final Award (the "Set

---

[7] *See* Akhtar Decl. Ex. B, at ¶67.

[8] *See* Prior Application, 1:20-mc-00209 (ECF 4, at ¶41).

[9] *See* Pencu Decl. Ex. 5; *see also* Pencu Decl. Ex. 6, at p. 8.

[10] Quinn died in 2015.  *See* Akhtar Decl. Ex. B, at ¶¶6-7, 31.VR Advisory owns 25% of P&ID and non-party Lismore Capital Ltd ("Lismore Capital"), a Cayman Island entity, owns 75% of P&ID.  *See* Pencu Decl. Ex. 14, at pp. 2-3.

[11] Since 2018, VR Respondents and P&ID have engaged a team of lobbyists, including Kobre & Kim LLP ("Kobre & Kim"), to influence the United States government against Nigeria.  *See* Pencu Decl. Exs. 12-14.

Aside Trial"). Evidence obtained earlier this year by Nigeria in this District from banks under Section 1782 showed P&ID paying bribes to corrupted Nigerian officials, and was instrumental in the English court's findings. On September 29, 2020, the English court ordered the release of a previously ordered $200 million security, and ordered P&ID to pay Nigeria's legal fees and expenses.[12] Nigeria makes this Application to gather evidence for the Set Aside Trial.

VR Respondents do not care that the Final Award is a fraud. Even if one were to give VR Respondents the benefit of the doubt that they did not suspect the fraud when they purchased the Final Award, upon seeing the evidence and reading the English court's judgment, an ethical investor would have stopped enforcement efforts. Instead, VR Respondents are – through P&ID, the shell they control –attempting to complete the fraud by enforcing the Final Award and collecting billions of dollars from the people of Nigeria that would cripple the country.

In this Application, Nigeria requests the Court's permission to issue subpoenas to VR Respondents to obtain discovery concerning: (1) the acquisition of P&ID by VR Advisory and non-party Lismore Capital; (2) the P&ID acquisition as it relates to English champerty law; (3) financial records concerning P&ID, its known affiliate entities and their owners (past and current); (4) P&ID's historic and current business operations relating to the GSPA and the Awards; (5) documents concerning the negotiation, execution and enforcement of the GSPA; (6) documents concerning the procurement of and efforts to enforce the Awards by P&ID; and (7) documents concerning lobbying activities by P&ID, including its owners, lobbyists or agents, in the United States in furtherance of P&ID's effort to enforce the Final Award and to stymie Nigeria's evidence gathering. VR Advisory is a sophisticated and experienced vulture fund with a focus on sovereign debt. VR Respondents no doubt conducted extensive due diligence before investing in the Final Award by purchasing an interest in P&ID, and are likely to have relevant information.

---

[12] *See* Akhtar Decl., at ¶6.

## STATEMENT OF FACTS

### I.      The Gas Supply and Processing Agreement (GSPA)

The GSPA required P&ID to construct a natural gas processing facility in Nigeria to process natural gas, known as "wet gas," supplied by Nigeria by removing natural gas liquids from the wet gas, and returning to Nigeria lean gas suitable for use for power generation.[13]  P&ID never broke ground on the project, and  Nigeria's criminal investigations have uncovered that P&ID and its affiliates bribed former Nigerian officials to award the GSPA to P&ID, a BVI shell company with no financial resources, to construct a natural gas processing plant that P&ID claims would have cost between $500 million - $700 million.[14]

### II.     The Arbitration

P&ID never performed the GSPA, and instead, on August 22, 2012, P&ID commenced the Arbitration demanding $6 billion in lost profits.[15]  P&ID's primary witness, co-founder Quinn, submitted a written statement falsely claiming that P&ID incurred $40 million in preparatory costs for the GSPA, that "all of the project finance was in place," and that "90 percent of the engineering designs had been completed" for the GSPA.[16] Based almost entirely on Quinn's statement, on January 31, 2017, the Tribunal issued the $6.6 billion Final Award in P&ID's favor.[17]

Nigeria's counsel at the Arbitration, Olasupo Shasore, failed to proffer any reasonable defense, and evidence indicates he was compromised against Nigeria's interest.  For example, Shasore failed to cross examine Quinn, and the only government witness at the Arbitration, Ikechukwu Oguine (legal director at the Nigerian National Petroleum Corporation), was

---

[13] *See* Pencu Decl. Ex. 1, at Section 2.

[14] *See* Akhtar Decl. Ex. B, at ¶¶106-112, 117-129, 191-199, 206-210.

[15] *See* Akhtar Decl. Ex. B, at ¶¶27-28.

[16] *See* Akhtar Decl. Ex. B, at ¶¶34-35.

[17] *See* Akhtar Decl. Ex. B, at ¶¶55, 65-67.

disregarded by the Tribunal because his written statement – a statement Shasore prepared – "gave no relevant evidence."[18]   Also, Nigeria has learned that during the Arbitration Shasore made $100,000 payments (equivalent to 20 years of salary) to Oguine, and a senior lawyer at the Ministry of Petroleum, Folakemi Adelore, both of whom were part of the Nigerian delegation assigned to conduct settlement negotiations with P&ID.[19]   The English court has made a *prima facie* finding these payments were intended as hush money.[20]

### III.   The English Proceedings

In March 2018, P&ID filed the Enforcement Proceeding to enforce the Final Award in the United Kingdom.[21]   Nigeria objected on grounds relating to jurisdiction, and the excessive size of the Final Award.[22]   P&ID's enforcement application was granted on August 16, 2019, with execution stayed pending resolution of the later of Nigeria's appeal or the Set Aside Proceeding.[23]

Subsequently, Nigerian authorities discovered additional evidence demonstrating that the GSPA was procured by fraud, and on December 5, 2019, Nigeria commenced the Set Aside Proceeding to challenge the GSPA and Awards.[24]   On September 4, 2020 the English court issued the English Judgment, which included the following finding:

> Nigeria has established a strong prima facie case that the GSPA was procured by
> bribes paid to insiders as part of a larger scheme to defraud Nigeria.  There is also
> a strong prima facie case that P&ID's main witness in the arbitration, Mr. Quinn,
> gave perjured evidence to the Tribunal and that, contrary to that evidence, P&ID
> was not in the position to perform the contract.  As to the Jurisdiction and Liability
> stages of the arbitration, there is a prima facie case that they were tainted by the
> conduct of Nigeria's advocate, Mr. Shasore.[25]

---

[18] *See* Akhtar Decl. Ex. B, at ¶¶48, 55, 102.

[19] *See* Akhtar Decl. Ex. B, at ¶¶ 44-45, 102-105, 221, 225.

[20] *See* Akhtar Decl. Ex. B, at ¶¶104-105, 225.

[21] *See* Akhtar Decl. Ex. B, at ¶77.

[22] *See* Akhtar Decl. at ¶6.

[23] *See* Akhtar Decl. at ¶6.

[24] *See* Akhtar Decl. at ¶7.

[25] *See* Akhtar Decl. Ex. B, at ¶ 226.

Based on these findings, the English court granted Nigeria's request for an extension of time to request that the Awards be set aside and challenge the enforceability of the Final Award at the forthcoming Set Aside Trial.[26]  In connection with the Set Aside Trial, Nigeria served its Statement of Case on September 18, 2020, P&ID served its Defense on November 6, 2020, and Nigeria filed its Reply on December 30, 2020.[27]

## IV.    **P&ID's Lobbying in the United States**

On March 16, 2018, P&ID filed a petition in the District Court for the District of Columbia to confirm the Final Award, *Process and Industrial Developments Limited v. Federal Republic of Nigeria et al.*, Civil Action No. 18-594 (D.D.C.) (the "DC Action").[28]  Nigeria is asserting its sovereign immunity in the DC Action.  P&ID tried to force Nigeria to plead its substantive defenses before the sovereign immunity defense was heard.  That led to Nigeria's successful appeal to the D.C. Circuit Court of Appeals, which held the District Court must adjudicate Nigeria's sovereign immunity defense before Nigeria answers on the merits. *Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576 (D.C. Cir. 2020).  On remand, the District Court denied Nigeria's motion to dismiss on sovereign immunity grounds, *See Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*, 2020 WL 7122896 (D.D.C. Dec. 4, 2020) (Cooper, J.), and Nigeria has filed an interlocutory appeal of that ruling.

Once it became apparent to VR Respondents that P&ID could not fast track the DC Action through the US court system, and Nigeria's criminal investigations uncovered evidence of P&ID's fraud and irregularities with the Arbitration, VR Respondents and P&ID shifted their focus to engage in wide ranging political lobbying targeted at the U.S. Department of State, House of

---

[26] *See* Akhtar Decl. Ex. B, at ¶¶274-77; *see also* Akhtar Decl., at ¶¶14-15.

[27] *See* Akhtar Decl., at ¶17.

[28] *See* Pencu Decl. Ex. 26.

Representatives and Senate to facilitate P&ID's (and now VR Respondents) fraud against Nigeria.[29]  On November 29, 2018, Kobre & Kim and DCI Group, LLC ("DCI"), a Washington D.C. based lobbying firm, registered with the U.S. Senate as P&ID's lobbyists.[30] While Kobre & Kim purports to be lobbying the United States government on "[i]ssues related to United States-Nigerian relations," Nigeria has no record of any such effort.[31]  P&ID has no known business operations, yet P&ID's lobbyists claim that P&ID operates a "Public Affairs" business, or an "Oil and gas engineering and project management" business.[32]

VR Respondents have made concerted efforts to avoid the judicial system, and through its network of lobbyists and public relations operatives have used dog whistle tactics to manufacture criticism of any investigation or evidence gathering concerning the circumstances surrounding the GSPA and Final Award.  To date, P&ID (funded by VR Respondents) has spent $550,000 on its team of lobbyists, $70,000 of which was paid to Kobre & Kim, to push the United States government to recognize the Final Award.[33]

VR Respondents and P&ID seek to transform the Final Award into a political issue, and avoid the judicial system through which evidence of the fraud has been uncovered. These efforts include arguing before this Court that requests for basic historical documentary evidence proceed

---

[29] According to Kobre and Kim's Lobbying Registration VR Advisory may "directly or indirectly, in whole or in major part," control, direct, and finance activities of P&ID.  See Pencu Decl. Ex. 14.

[30] See Pencu Decl. Exs. 13-14.  Kobre & Kim and DCI designate October 15, 2018 (two weeks after Nigeria's first appeal in the DC Action), as the day the lobbying campaign commenced. A third lobbying firm, Black Diamond Strategies LLC ("Black Diamond"), joined the P&ID lobbying team in January 2019. See Pencu Decl. Exs. 12, 15. Black Diamond and DCI Group have significant ties to the Republican party, including former congressman Connie Mack (https://www.bdstrategies.com/who-we-are/connie-mack/) (last visited Dec. 18, 2020), Republican National Committee political director Rick Wiley (https://www.bdstrategies.com/who-we-are/rick-wiley/) (last visited Dec. 18, 2020), and campaign staffers to the Bob Dole and George W. Bush presidential campaigns.  Thus, it is of no surprise that after being retained, Republican members of Congress issued negative statements against Nigeria.

[31] See Pencu Decl. Exs. 8-10; Ex. 6, at p. 14.

[32] See Pencu Decl. Exs. 12-14.

[33] See Pencu Decl. Ex. 15. Kobre & Kim's lobbying registration states that VR Advisory and Lismore Capital share P&ID's lobbying interests. See Pencu Decl. Ex. 10, at p. 2.

through the notoriously slow MLAT process.[34] Since 2000, MLAT requests have increased by 85%, and in 2017 there were 9,131 pending MLAT and extradition requests[35] VR Respondents and P&ID hope for Nigeria's requests to suffer the same fate and for time to grind Nigeria's progress in uncovering this massive fraud to a halt.

V.   **Prior Section 1782 Applications**

A.   **Criminal Investigations in Nigeria**

In August 2018, Nigeria's Economic and Financial Crimes Commission (the "EFCC") opened an investigation into the origins of the GSPA, and specifically, how a shell entity like P&ID with no financing or track record of conducting any business in Nigeria secured a twenty-year agreement that P&ID claims would have generated hundreds of millions of dollars in annual profits.[36] P&ID's principals have a history of manufacturing claims against Nigeria.[37] In 2010, P&ID's co-founder Quinn created a Nigerian clone shell entity sharing the same name as a British military contractor to sue Nigeria purporting it was related to the British contractor.[38] Quinn and Cahill have also been associated with a previous arbitration commenced against Nigeria by a company named IPCO (Nigeria) Limited, which arbitration the English Commercial Court found to be *prima facie* fraudulent.[39]

The EFCC's investigations have resulted in numerous criminal prosecutions against those involved in P&ID's fraud scheme, and the evidence strongly indicates that hundreds of thousands of dollars were paid to Nigerian officials to buy their silence and obstruct Nigeria's efforts to

---

[34] *See* Pencu Decl. Ex. 29, at p. 23; Ex. 38, at p. 24.

[35] *See* Pencu Decl. Ex. 29, at pp. 14, 23.

[36] *See* Prior Application, 1:20-mc-00209 (ECF 4), at ¶21.

[37] *See* Pencu Decl. Ex. 6, at pp. 12-14.

[38] *See* Pencu Decl. Ex. 6, at p. 13.

[39] *See* Pencu Decl. Ex. 6, at p. 13.  Quinn and Cahill made direct payments to IPCO employees through their company, Eastwise Trading Limited.

mount a defense in the arbitration.[40]   As part of Nigeria's efforts to root out corruption connected to the fraudulently obtained Awards, Nigeria sought evidence outside of Nigeria to learn the full scope of the fraud, and in particular to identify the corrupted officials who were involved.  Without waiver of privilege, the evidence collected by the EFCC was provided to Nigeria's solicitors and barristers in England who were attempting to mount a challenge to the Final Award in England.

**B.   Bank Application**

On March 25, 2020, Nigeria and its Attorney General, Abubakar Malami (together, "Applicants"), filed a Section 1782 application against ten banks in aid of the Nigerian Proceedings, *In re Federal Republic of Nigeria et al*, 1:20-MC-00169-LGS (S.D.N.Y.) (the "Bank Application").[41]   On April 24, 2020, P&ID submitted a response in the Bank Application, requesting access to Applicants' discovery and requested that the Court (Schofield, J.) "proceed on the basis that Nigeria intends to use this discovery in Nigerian proceedings only."[42]

On April 29, 2020, Applicants objected to P&ID's preemptive efforts to obstruct Applicants' evidence gathering efforts.[43]   Applicants argued that they were entitled to use the discovery material in England or other foreign proceedings, citing the Federal Rules (which P&ID conceded would govern the discovery) and *In re Accent Delight*, 869 F.3d at 135 (2d Cir. 2017), in which the Second Circuit held that discovery obtained for one foreign proceeding under Section 1782 could be deployed in other foreign proceedings.[44] Applicants prevailed on the argument. Applicants also argued that P&ID's assertion it was an "interested party" entitled to access to the

---

[40] *See* Akhtar Decl. Ex. B, at ¶¶98-129, 134-139, 221-225.

[41] In the Bank Application, Applicants requested authority to conduct discovery against the following financial institutions: (1) HSBC Bank (USA); (2) New York Branch of Standard Chartered Bank; (3) Deutsche Bank Trust Co. Americas; (4) Citibank, N.A.; (5) Allied Irish Banks plc, (6) JPMorgan Chase, N.A.; (7) Standard New York, Inc.; (8) United Bank for Africa; (9) Bank of Cyprus; and (10) Fortis Private Banking Singapore Limited.

[42] *See* Pencu Decl. Ex. 16.

[43] *See* Pencu Decl. Ex. 17, at p. 6.

[44] *See* Pencu Decl. Ex. 17, at p. 6.

discovery produced in the Bank Application – based on a vague claim to be "Nigeria's adversary in the foreign proceedings" – was speculative.[45]   On May 7, 2020, Judge Schofield granted the Bank Application, and granted P&ID access to discovery produced in response to subpoenas issued by Applicants (the "Schofield Order"), but did not grant P&ID's requested use restriction.[46]

After the Schofield Order, Applicants received discovery from the subpoenaed banks, and shared the discovery with P&ID in accordance with the Schofield Order.[47]   Among the produced records was evidence of suspected bribery payments to Nigerian officials and their family members.[48]   Having just lost the issue before Judge Schofield, P&ID knew that it had no basis for a use restriction to block Applicants' use of lawfully obtained discovery.  Notwithstanding, P&ID repeatedly requested for Applicants not to use the evidence in England – where "P&ID expect[ed]"[49] financial records evidencing P&ID's fraud would be used – and issued a blanket demand that Applicants' counsel "not provide your client with any information produced pursuant to the subpoenas … or use any information produced pursuant to the subpoenas" based on a fabricated rationale that the discovery produced by the banks concerning its owner VR Advisory was purportedly "beyond the scope" of the subpoenas.[50]

P&ID is attempting to enforce a $10 billion fraudulent Final Award against Nigeria, and yet it apparently expected Applicants to suppress (and its counsel to withhold from Applicants) evidence of P&ID's fraud.  Applicants rejected the absurd requests promptly each time P&ID made them.[51]

---

[45] *See* Pencu Decl. Ex. 16, at p. 6; Ex. 17, at pp. 5-6.

[46] *See* Pencu Decl. Ex. 18.

[47] *See* Declaration of Christopher J. Major ("Major Decl."), at ¶7; *see also* Pencu Decl. Ex. 42.

[48] *See* Akhtar Decl. Ex. B, at ¶¶124, 198.

[49] *See* Pencu Decl. Ex. 16, at p. 7.

[50] *See* Pencu Decl. Ex. 40.

[51] On June 8, 2020, Applicants rejected P&ID's request to restrict Applicants' use of discovery obtained from the banks.  *See* Pencu Decl. Ex., 32, at p. 1; Ex. 41.  *See* Major Decl. ¶¶8-14.

By letter dated June 24, 2020, P&ID wrote to Judge Schofield to complain that evidence of P&ID's fraud had been filed by Nigeria in the English Proceedings, and requested a pre-motion conference so it could again try to convince Judge Schofield to "limit [] Nigeria's use of any discovery obtained to … certain criminal investigations and prosecutions in Nigeria."[52]  Applicants again objected to a use restriction, noting that the Schofield Order did not impose use restrictions, and that neither the Federal Rules nor Section 1782 restricted Applicants' use of lawfully obtained discovery in proceedings other than those identified in the Bank Application.[53]

Judge Schofield conducted a pre-motion conference on July 9, 2020, to discuss P&ID's request for a protective order.  At the conference, Applicants informed Judge Schofield that several of the wire transaction records P&ID sought to restrict evidenced P&ID's bribery payments to former Nigerian officials.[54]  Judge Schofield noted the "unprecedented" nature of P&ID's request for a protective order where it was "not the producing party, nor the requesting party."[55]   Despite failing to provide a legal basis for its request, P&ID continued to push for a use restriction, stating:

> P&ID: …I won't go over the whole story, but essentially, as we put in our letter, P&ID obtained an arbitration award against Nigeria, which Nigeria is now seeking to undermine through a criminal investigation, and then also an application to set aside the award in the UK… [and]this is a situation where our client has an interest in making sure that Nigeria adheres to the limitation of the discovery order that your Honor granted based on the application that it filed.

> Court: … I understand that P&ID is the target or subject of the criminal investigation that Nigeria is undertaking, and that that was the purpose for the request, and you're objecting because they are using documents elsewhere….

> P&ID: … so those are requests calling for wire transfer data about transactions involving VR Capital, which is an investor in P&ID, as well as Lismore Capital, which is another investor in P&ID.  But these transactions are being used at this very moment by Nigeria in its case against P&ID in the UK. And –

---

[52] *See* Pencu Decl. Ex. 19, at p. 1.

[53] *See* Pencu Decl. Ex. 20, at p. 3.

[54] *See* Pencu Decl. Ex. 21, at 11:6-12.

[55] *See* Pencu Decl. Ex. 21, at 3:15-22.

Court: I understand that.[56]

Later, P&ID reiterated its request for Judge Schofield to enter a protective order and impose a use restriction on Applicants, engaging in the following exchange with the court:

> P&ID: … And this is not just a hypothetical concern about, oh, they obtained more documents than they should have; … but, in fact, Nigeria has been using some of that very discovery against P&ID in the English proceedings, claiming that these transactions supposedly show wrongdoing by our client and its alleged associates.
>
> Court:  … can you cite me any law that gives you – meaning your client – the authority or standing, or call it what you want, to ask for release from that?
> …
> Court: The fact is you haven't cited any other cases.  And I presume – I mean, you're a good lawyer from a good law firm.  I assume that's something that you looked for when you made the current application. Is that right?
>
> P&ID: Well, actually, not, your Honor.[57]

With regard to P&ID's hypothetical that had the Bank Application been made for the English proceedings either P&ID or the responding financial institutions would have taken a different position, Applicants pointed out that P&ID's initial response plainly anticipated the possibility that Applicants would use evidence of P&ID's fraud in related English proceedings, and in the Schofield Order the court declined P&ID's request for a use restriction.[58]  As for the responding financial institutions, Applicants directed the Court to the stipulated protective order between Applicants and J.P. Morgan Chase Bank, N.A. ("JPMC"), which Judge Schofield so-ordered the next day, explicitly permitting Applicants to use discovery produced by JPMC "in proceedings arising out of or in connection with the Nigerian Proceedings, the GSPA, the Award, or the attempted enforcement, confirmation, vacatur, or other challenge of the Award."[59]

---

[56] See Pencu Decl. Ex. 21, at 4:6-5:19.

[57] See Pencu Decl. Ex. 21, at 7:8-8:11.

[58] See Pencu Decl. Ex. 21, at 20:17-21:1.

[59] See Pencu Decl. Ex. 21, at 19:24-20:16; see also Pencu Decl. Ex. 22, at ¶6.  JPMC is not a party in any English proceedings relating to the Awards.

Evident from the July 9, 2020 hearing is that Judge Schofield was fully apprised of Applicants' use of discovery in related English proceedings, P&ID failed to provide a legal basis for a use restriction, and the court declined to impose a use restriction on Applicants.

### C. Prior Application

On May 12, 2020, Applicants filed the Prior Application in further aid of the Nigerian Proceedings. On May 14, 2020, the court (Engelmayer, J.) granted the Prior Application (the "Prior Order"),[60] and on June 26, 2020, VR Respondents moved to vacate the Prior Order and quash the subpoenas issued pursuant to the Prior Order (the "Motion to Vacate").[61] The Motion to Vacate was filed two weeks before the July 9, 2020 hearing where Judge Schofield rejected VR Respondents' second request for Judge Schofield to impose a use restriction on Applicants.

In the Motion to Vacate, VR Respondents asserted that the Prior Application was made in circumvention of the Nigeria MLAT, a bilateral treaty between the United States and Nigeria for assistance on criminal matters, and that the Nigerian Proceedings did not satisfy Section 1782's "for use" requirement. In opposition, Applicants argued that the Prior Application did not circumvent the Nigeria MLAT, quoting Article XIX of the Nigeria MLAT, which provides that the treaty "shall not prevent or restrict either of the Contracting Parties from granting any assistance … under the laws of the Contracting Parties."[62] Applicants also noted that P&ID's request for a use restriction in the Bank Application had been rejected, and that the May 7, 2020 Schofield Order imposed no use restriction on Applicants.[63]

In VR Respondents' July 17, 2020 reply, filed more than one week after Judge Schofield rejected P&ID's second request for a protective order, VR Respondents failed to inform Judge

---

[60] *See* Prior Application, 1:20-mc-00209 (PAE) (ECF 10).

[61] *See* Prior Application, 1:20-mc-00209 (PAE) (ECF 20).

[62] *See* Prior Application, 1:20-mc-00209 (PAE) (ECF 25, at p.11); *see also* Pencu Decl. Ex. 7, at Article XIX.

[63] *See* Prior Application, 1:20-mc-00209 (PAE) (ECF 25, at pp. 6-7).

Engelmayer that Judge Schofield had twice rejected P&ID's request for a protective order and use restriction, and continued to insinuate that Judge Schofield was unaware of Applicants' use of lawfully obtained discovery in related English proceedings.[64]  As VR Respondents and P&ID are represented by the same lawyers from the same law firm, there is no doubt that VR Respondents were aware of Judge Schofield's orders.  As a result, Judge Engelmayer did not have the benefit of the full record of proceedings before Judge Schofield.   On November 6, 2020, Judge Engelmayer issued the Vacate Order.  *See* Vacate Order, at *11.

In the Vacate Order, Judge Engelmayer found that the "first and third statutory requirements [for Section 1782] are easily met," but questioned whether the Set Aside Trial in England was "adjudicative in nature."  *Id*. at *5.  Neither party challenged the adjudicative nature of the Set Aside Trial.  To the contrary, VR Respondents conceded the adjudicative nature of the Set Aside Trial admitting that the English court "found that Nigeria … had established a *prima facie* case of fraud on the part of P&ID," and that "Nigeria will have to prove its fraud allegations at a full trial with witnesses."[65]   Despite the parties' consensus on the adjudicative nature of the Set Aside Trial, Judge Engelmayer determined in *dicta* that the English proceedings were not adjudicative under Section 1782.  *Id*.[66]

As to the *Intel* factors, Judge Engelmayer found "there is no principle of law" compelling Applicants to proceed via the Nigeria MLAT, but concluded that the Prior Application circumvented the Nigeria MLAT.  *See* Vacate Order at *8.  This finding was premised on VR Respondents' false assertion that Judge Schofield was not apprised of Applicants' position that Applicants were entitled to use the discovery in related English proceedings.   Before Judge

---

[64] *See* Prior Application, 1:20-mc-00209 (PAE) (ECF 25, at p.10).

[65] *See* Pencu Decl. Ex. 23.

[66] Judge Engelmayer "assume[d] *arguendo*" that the Prior Application satisfied the "for use" requirement and concluded that Applicants satisfied Section 1782's statutory requirements.  *See* Vacate Order at *6.

Schofield, P&ID stated that it "expect[ed]" that evidence of P&ID's fraud would be used in related proceedings,[67] but before Judge Engelmayer, VR Respondents (represented by the same lawyers from the same law firm) feigned ignorance and claimed it was led to believe that Applicants had "no intention to use that information in the English proceeding."[68]

Based on VR Respondents' incomplete presentation of the prior proceedings before Judge Schofield, Judge Engelmayer found that Applicants' "misled Judge Schofield" in the Bank Application when discovery was used in related English proceedings.  From this finding, the Court concluded that it "cannot find a sound justification for Nigeria to forgo the MLAT review procedure," and that oversight from the DOJ would "serve salutary purposes." *See* Vacate Order, at *10.  The Court reasoned that the DOJ's procedures for the Nigeria MLAT were more rigorous than Section 1782, and that the DOJ would limit Nigeria's request to criminal proceedings. *Id.* at *8.  However, the Nigeria MLAT operates under the same procedural framework as Section 1782, and the Technical Analysis for the Nigeria MLAT states that the treaty can "be invoked in matters where no criminal prosecution or investigation is pending, such as a civil forfeiture proceeding involving assets acquired through a criminal offense covered by the Treaty."[69]  The purpose of the Nigeria MLAT is to encourage cooperation and "improve[] … relations between the United States and Nigeria," not to impede Nigeria's investigation into a massive $10 billion fraud.[70]

Within the DOJ, the Office of International Affairs ("OIA") is the "Central Authority" of the United States charged with processing MLAT requests.[71]   Since 2012, the "OIA has

---

[67] *See* Pencu Decl. Ex. 39, at 43:7-13.

[68] *See* Pencu Decl. Ex. 16, at p. 7.

[69] *See* Pencu Decl. Ex. 37, at pp.87, 88.  The Nigeria MLAT "accords the courts broader authority to execute requests than does Title 28, United States Code, Section 1782."  *Id.* at fn.1.

[70] *See* Pencu Decl. Ex. 37, at pp. 87, 102.

[71] *See* Pencu Decl. Ex. 29, at p. 17 fn. 3.

experienced a dramatic increase in requests for mutual legal assistance (MLA)."[72]   The MLAT

backlog reached an "all-time high of 13,421 in March 2016," and because "OIA's staffing did not

keep pace with these increased demands," MLAT requests have not been handled in a timely

manner.[73]   For example, during the "first 12 weeks of FY 2018 alone," the OIA received 1,637

MLAT requests, and in 2019, the DOJ acknowledged that "[s]ecuring sufficient funding to sustain

OIA operations is the biggest external challenge that the Criminal Division currently faces," and

reiterated the need for "Mutual Legal Assistance Treaty (MLAT) reform … to avoid insolvency

and further backlogs."[74]

The Court dismissed Applicants' concerns that the Section 1782 process is significantly

more efficient than the cumbersome MLAT process *See* Vacate Order, at *9.  Applicants' timing

concern is legitimate and supported by the DOJ's statistical analysis of the MLAT program.  Judge

Engelmayer's dismissal of Applicants' timing concern is an issue that will be raised in Applicants'

appeal of the Vacate Order.

VR Respondents advocated for Judge Engelmayer to refer Applicants' discovery requests

to Washington D.C., because P&ID has invested two years and hundreds of thousands of dollars

lobbying Congress and the State Department.  P&ID's lobbying to the State Department is of

concern because "MLATs … are negotiated by the Department of State in cooperation with the

Department of Justice,"[75] and the State Department works closely with the DOJ on matters related

to MLAT interpretation.[76]  P&ID's (and VR Respondents') targeted efforts can have no other

purpose than to negatively impact the DOJ's review of requests for assistance by Nigeria.

---

[72] *See* Pencu Decl. Ex. 29, at p. 20.

[73] *See* Pencu Decl. Ex. 29, at pp. 20, 23.

[74] *See* Pencu Decl. Ex. 29, at pp. 4, 14-15, 19-21.

[75] *See* Pencu Decl., Ex. 35, at p. 1.

[76] *See* Pencu Decl. Ex. 37, at p. 89.

VR Respondents' objective is to evade the impartial scrutiny of a United States District Court and divert Applicants to an agency that is already overburdened with thousands of back-logged requests and where VR Respondents' agents (including their lobbyists and lawyers) have entrenched relationships. Tellingly, VR Respondents' counsel, Kobre & Kim, failed to disclose its lobbying activities on P&ID's behalf to Judge Engelmayer, or whether as P&ID's lobbyist Kobre & Kim discussed the Nigeria MLAT with anyone within the government. Kobre & Kim's lobbying efforts are not privileged, and because the efforts to enforce the Final Award and suppress evidence are part of the ongoing fraud, Nigeria should be permitted discovery concerning the lobbying activities VR Respondents are directing through their lobbying firms.

Nigeria is prohibited from seeking discovery from VR Respondents for the Nigerian Proceedings unless the Second Circuit reverses the Vacate Order. However, as it is likely that the Set Aside Trial will occur within the next 18 months, and evidence disclosure will occur much sooner, Nigeria seeks to conduct discovery in aid of the English Proceedings.[77]

## ARGUMENT

### A. The Application Meets the Statutory Requirements Of Section 1782(a)

Section 1782 discovery may be granted where: (1) the person from whom discovery is sought resides or is found in the district where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by an interested person. *In re Edelman*, 295 F.3d 171, 175 (2d Cir. 2002). The Application satisfies all three requirements.

#### 1. VR Respondents are Found in This District

VR Respondents conduct an alternative investment business in this district, maintain their principal place of business or residence within this district, and have maintained a systematic and

---

[77] *See* Akhtar Decl. at ¶¶17-19.

continuous presence within this district for purposes of Section 1782.[78]   *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 24, 246 (2004) ("Section 1782(a) provides that a federal district court "may order" a person 'resid[ing]' or 'found' in the district to give testimony or produce documents ….").   In the Prior Application, counsel for VR Respondents consented to accept service, acknowledging that VR Respondents are "found" in this district for purposes of Section 1782.[79]

### 2.   The Discovery Nigeria Seeks is "For Use" in a Foreign Tribunal

The "for use" requirement is satisfied upon showing that the foreign proceeding: (1) is adjudicative in nature; and (2) is pending before a foreign or international tribunal.  *Intel*, 542 U.S. at 259; 28 U.S.C. §1782.  Nigeria's request for discovery to prove P&ID's fraud against Nigeria at the Set Aside Trial satisfies the "for use" requirement.  *See In re Accent Delight*, 869 F.3d at 131 ("for use" means the "*practical ability* of an applicant to place a beneficial document – or the information it contains – before a foreign tribunal.") (emphasis in original);  *see also Union Fenosa Gas, S.A. v. Depository Trust Company*, 2020 WL 2793055 *4 (S.D.N.Y. May 29, 2020) (PAE) ("Ultimately, so long as a [§]1782 applicant has establish[ed] that it will have some means of actually using the evidence in the foreign proceeding, in the absence of authoritative proof that a foreign tribunal would reject the evidence obtained, a district court should not reject a Section 1782 application for failure to satisfy the 'for use' ground.").

The Set Aside Trial is an adjudicative proceeding before the English court, a recognized foreign tribunal.  *See In re Catalyst Managerial Services, DMCC*, 680 Fed.Appx.37 (2d Cir. 2017) (summary order) (Section 1782 order affirmed where the applicant "presents a colorable claim of being able to use the discovery in an ongoing foreign proceeding" in the English courts); *see also*

---

[78] *See* Pencu Decl., at ¶¶45-50.

[79] *See* Pencu Decl. Ex. 24.

*In re Gorosan Limited*, 435 F.Supp.3d 589, 599 (S.D.N.Y. 2020) (a proceeding is "adjudicative" where the merits are in dispute, and discovery may have "potential implications on the outcome of the case). Under English law, applications to set aside an arbitral award under Sections 66, 67 and 68 of the Arbitration Act 1996 commence distinct judicial proceedings before the English court, and the Tribunal's prior tainted findings (both legal and factual) are not *res judicata*, and issues related to the GSPA and Awards will be freshly determined.[80]

At the upcoming Set Aside Trial the English court will review the underlying basis for the Tribunal's jurisdiction, consider evidence not previously presented to or considered by the Tribunal, and render a decision based on a *de novo* review of the evidence presented.[81] Nigeria must prove its case by a "balance of probabilities," which is the English law equivalent of the "preponderance of the evidence" standard applied to civil trials in the United States.[82] If the English court confirms that the GSPA and Awards were procured through fraud, the Awards are likely to be set aside as void and unenforceable.[83]

### 3.  <u>Nigeria is an Interested Party</u>

Nigeria is an interested party under Section 1782. Nigeria is a sovereign nation seeking discovery in aid of foreign civil proceedings to set aside a fraudulently procured $10 billion arbitral award. "One of the twin aims of the statute is to encourage reciprocity by foreign governments. To deny foreign governments the ability to utilize this statute is hardly conducive to encouraging cooperation and reciprocal treatment of the United States in the international arena." *In re Republic of Kazakhstan*, 110 F.Supp.3d 512, 516 (S.D.N.Y. 2015) (granting Kazakhstan's Section 1782 application for discovery). Moreover, as the applicant in the Set Aside Proceeding and

---

[80] *See* Akhtar Decl., at ¶9.

[81] *See* Akhtar Decl., at ¶20.

[82] *See* Akhtar Decl., at ¶20.

[83] *See* Akhtar Decl., at ¶¶21-22.

respondent in the Enforcement Proceeding, Nigeria has the requisite "participat[ory] rights …
[and] reasonable interest in obtaining [judicial] assistance," to qualify as an "interested person"
under Section 1782.  *Intel Corp.*, 542 U.S. at 256; *Application of Esses*, 101 F.3d 873, 875 (2d Cir.
1996) (a party to a foreign proceeding qualifies as an "interested person" under Section 1782).

### B.  The Discretionary Factors Weigh In Favor Of Nigeria

Once the statutory elements of Section 1782(a) are met, requests for assistance should be
liberally granted.  A district court's decision to grant a Section 1782 application is guided by the
discretionary *Intel* factors: (1) whether the person from whom discovery is sought is within the
foreign court's jurisdiction; (2) the receptivity of the foreign tribunal to federal court assistance;
(3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and
(4) whether the request is unduly intrusive or burdensome.  *Intel Corp.*, 542 U.S. at 264-265.  The
*Intel* factors weigh in favor of granting the Application.

Since Section 1782's passage in 1948, "Congress has expressed as its aim that the statute
be interpreted broadly," and "provide *equitable* procedures for the benefit of litigants in
international litigation."  *In re Edelman*, 295 F.3d at 180 (emphasis in original).  "Section 1782's
investment of broad discretion in the district court [is] an invitation for district judges to fashion
creative means of implementing the statute's double goal: promoting efficiency in international
litigations and persuading other nations, by example, to do the same.  Absent specific directions
to the contrary from a foreign forum, the statute's underlying policy should generally prompt
district courts to provide some form of discovery assistance."  *Euromepa S.A. v. R.Esmerian, Inc.*,
51 F.3d 1095, 1102 (2d Cir. 1995) (vacating denial of Section 1782 application).

### 1.  VR Respondents are Not Within the Jurisdiction Of The English Courts

Under the first *Intel* factor, the "relevant inquiry … is [w]hether the documents or
testimony sought are within the <u>foreign tribunal's jurisdictional reach</u>, not whether they are within

the jurisdictional reach of some other court." *In re Warren*, 2020 WL 6162214 *6 (S.D.N.Y. Oct. 21, 2020) (PGG) (emphasis in original).  Where the party is a "nonparticipant[] in the foreign proceeding" the first *Intel* factor weighs in favor of granting the Section 1782 application because the evidence "may be unobtainable absent §1782(a) aid."  *Intel*, 542 U.S. at 264.  VR Respondents are not parties to the English Proceedings, are outside of the jurisdictional reach of the English court, and cannot be compelled to produce evidence without this Court's assistance.

While VR Advisory is a twenty-five percent owner of P&ID, VR Respondents maintain that P&ID is a separate commercial entity and the subsidiary cannot direct its parent to produce documents.  Section 1782 permits Nigeria to seek discovery from VR Respondents concerning VR Respondents' knowledge of P&ID, the GSPA and Arbitration.  *See In re Top Matrix Holdings*, 2020 WL 248716 *5 (S.D.N.Y. Jan. 16, 2020) (Ramos, J.) ("Notwithstanding the likelihood that Credit Suisse [AG] also has the requested information, Credit Suisse USA and Dougan have separate legal personalities, and neither is within the jurisdiction of the Swiss courts.").  Under circumstances where the English court has already made *prima facie* determinations of a strong case of fraud on the part of P&ID, there are serious concerns that P&ID may seek to evade the full effect of any disclosure order against it.  Thus, P&ID's potential disclosure of documents in the English Proceedings – and the possibility that some of the discovery Nigeria seeks from VR Respondents may also be in P&ID's possession – is irrelevant.[84]  *In re Application of Consellior Sas*, 2017 WL 449770 *2 (S.D.N.Y. Feb. 2, 2017) (assertion by US-based directors that "any testimony [offered] would be duplicative of evidence available to the magistrate in the French Proceeding" is an "unavailing" "attempt to impose an exhaustion or necessity requirement").

---

[84] Unlike *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d, 238 (2d Cir. 2018), where the respondent law firm was merely the custodian of confidential client documents produced in a prior US litigation, VR Respondents are 25% stakeholders in P&ID, the discovery Nigeria seeks are in VR Respondents' control, and thus, the unique concerns raised in *Kiobel* have no application.  *See Kiobel*, 895 F.3d at 241, 248.

### 2.   **The English Courts Are Receptive To Section 1782 Discovery**

Under the second *Intel* factor, courts consider whether a clear policy in the foreign jurisdiction prohibits the use of discovery obtained in the United States.  *In re Euromepa S.A.*, 51 F.3d 1095, 1100 (2d Cir. 1995).  This factor weighs in favor of Nigeria.  The Supreme Court has recognized that English courts are receptive to Section 1782 assistance.  *Intel Corp.*, 542 U.S. at 261-262 (citing *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] 1 App. Cas. 24, 41-42 (England's then highest court, the House of Lords, concluded that a litigant pursuing discovery under Section 1782 has done "what any party preparing his case in the High Court is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country … evidence which they believe they need in order to prepare and present their case.")).[85]

### 3.   **The Application Does Not Circumvent English Proof-Gathering Restrictions**

The third *Intel* factor considers "whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  The appropriate inquiry is whether the applicant is pursuing Section 1782 discovery in good faith.  *See In re Hansainvest Hanseatische Investment-GmbH*, 364 F.Supp.3d 243, 251 (S.D.N.Y. 2018) ("to demonstrate circumvention, Respondents must illustrate … that Applicants are engaged in a bad faith endeavor to misuse Section 1782").

"Proof-gathering restrictions are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information."  *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015) (emphasis in original).  Only where the materials sought are privileged or otherwise prohibited from being discovered or used

---

[85] A copy of *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] 1 App. Cas. 24 is attached as Exhibit E to the Akhtar Decl.

is the third *Intel* factor implicated. *See In re Accent Delight Int'l Ltd.*, 791 Fed.Appx. 247, 251 (2d Cir. 2019) (summary order) (Section 1782 order affirmed where objector failed to present a "policy or restrictions of any relevant foreign jurisdiction prohibit[ing] the discovery sought").

There are no proof-gathering restrictions that would prevent this Court from granting the Application, and English courts have affirmatively endorsed the use of Section 1782 as a means to conduct pre-trial discovery in aid of English proceedings.  *See South Carolina*, *N.V.*, [1987] 1 App. Cas. 24, 42 ("I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court.").  Regardless, Section 1782 does not "authorize denial of discovery … solely because such discovery is unavailable in the foreign court." *Mees*, 793 F.3d at 303.  Moreover, Nigeria is not required to exhaust discovery rights in England before seeking Section 1782 discovery, and "such a 'quasi-exhaustion' requirement … finds no support in the plain language of the statute and runs counter to its express purpose." *Id*. Nigeria again acknowledges it is bound by the Vacate Order, and agrees that discovery obtained pursuant to an order granting the Application will only be deployed in the English Proceedings.[86]

### 4.  <u>The Discovery Requested Is Not Unduly Burdensome</u>

The fourth *Intel* factor weighs in favor of Nigeria, because the discovery requested from VR Respondents is not unduly burdensome.  Section 1782 incorporates by reference the scope of discovery permitted by the Federal Rules.  *See* 28 U.S.C. §1782(a) (discovery shall be "in accordance with the Federal Rules of Civil Procedure").  Even if the requested discovery were determined to be unduly burdensome the Court should "reconcile whatever misgivings it may have about the impact of its participation in a foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa*, 51 F.3d at 1101.

---

[86] *See* Akhtar Decl., at ¶29.

Here, the burden of discovery should be placed in the context of the overall fraud dispute. If P&ID is successful in completing its scheme and collects on the $10 billion Award, VR Respondents as ultimate beneficiaries will receive a massive windfall.  VR Respondents are not true third parties to the dispute.  Moreover, the burden is minimal – clearly VR Respondents have maintained their records of such a large investment.  The documents and information likely to be produced pursuant to this Application include, without limitation, records of payments made by P&ID and its affiliates to individuals and entities that aided and abetted P&ID's fraud, the negotiation of the GSPA, the conduct of the Arbitration, and the purported value of the Final Award as of 2018.   In addition, Nigeria seeks communications and documents concerning VR Respondents and P&ID's lobbyists and internal communications concerning the issues identified above.  The Court should grant the Application because Nigeria's discovery requests are limited in scope and time, and targeted at gathering evidence for use in the English Proceedings.

## CONCLUSION

As the statutory requirements of Section 1782 are satisfied and the discretionary factors weigh in favor of granting this Application the Court should grant Nigeria's request for discovery.

Dated: January 8, 2021
New York, New York

**MEISTER SEELIG & FEIN LLP**

By: */s/ Alexander D. Pencu*
Alexander D. Pencu, Esq.
Christopher J. Major, Esq.
Austin D. Kim, Esq.
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: adp@msf-law.com
cjm@msf-law.com
adk@msf-law.com
*Attorneys for Applicant Federal Republic of Nigeria*