```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                         Docket #21mc0007
 THE FEDERAL REPUBLIC OF NIGERIA,   : 1:21-mc-00007-JGK-VF

                   Plaintiff,       :

   - against -                      :

 VR ADVISORY SERVICES, LTD, et al., : New York, New York
                                      November 1, 2022
                   Defendants.       :

------------------------------------ : TELEPHONE CONFERENCE

                    PROCEEDINGS BEFORE
               THE HONORABLE VALERIE FIGUEREDO,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          MEISTER SEELIG & FEIN LLP
                        BY:  CHRISTOPHER MAJOR, ESQ.
                             AUSTIN KIM, ESQ.
                        125 Park Avenue, 7th Floor
                        New York, New York  10017


For Defendant:          SULLIVAN & CROMWELL LLP
                        BY:  JEFFREY CHIVERS, ESQ.
                        125 Broad Street
                        New York, New York  10004

                        CHIVERS LLP
                        BY:  THEODORE ROSTOW, ESQ.
                        300 Cadman Plaza West, 12th Floor
                        Brooklyn, New York  11201

Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
```

Transcript produced by transcription service.

<u>**INDEX**</u>

**E X A M I N A T I O N S**

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                         PROCEEDINGS                    4

 2              THE CLERK:  This is the matter of the Federal

 3   Republic of Nigeria versus VR Advisory Services, et

 4   al., docket number 21mc07.  The Honorable Valerie

 5   Figueredo presiding.

 6              Counsel, please note your appearance for the

 7   record starting with plaintiff's counsel.

 8              MR. CHRISTOPHER MAJOR:  Good afternoon, Your

 9   Honor, Chris Major, Meister Seelig & Fein, we

10   represent the applicant, the Federal Republic of

11   Nigeria.

12              MR. AUSTIN KIM:  Good afternoon, Your Honor,

13   Austin Kim, also form Meister Seelig & Fein for the

14   applicant, the Federal Republic of Nigeria.

15              MR. JEFFREY CHIVERS:  Good afternoon, Your

16   Honor, Jeff Chivers for the VR respondents.

17              MR. THEODORE ROSTOW:  Good afternoon, Your

18   Honor, Theodore Rostow also with VR respondents.

19              HONORABLE VALERIE FIGUEREDO (THE COURT):  Good

20   afternoon, everyone, this is Judge Figueredo. Thank

21   you for being on here on a relatively I think short

22   notice, but I wanted to address the discovery disputes

23   raised by plaintiffs here, the Federal Republic of

24   Nigeria, in ECF number 53, the October 18, 2022,

25   letter.
```

```
 1                      PROCEEDINGS              5
 2          Mr. Major, since this is your request, if you
 3   want to start off?
 4          MR. MAJOR:  Yes, please, Your Honor, Chris
 5   Major on behalf of the applicant, Nigeria.  So we
 6   raised in our letter, Your Honor, three issues and
 7   I'll take them in order if that's okay with the Court.
 8   So the first issue deals with the scope of disclosure
 9   and there are, there are three sub issues within that
10   scope of disclosure dispute.
11          The first thing deals with the valuations and
12   purchase price that was paid by the VR respondents
13   when they made the investment in Process and
14   Industrial Development which the only asset, and we've
15   asserted this for years now in 1782s here in the
16   United States and it's not been disputed, that the
17   only assets P&ID has is the award.  Therefore, the VR
18   respondents essentially required 25 percent of this
19   award which is now valued in excess of $10 billion.
20          We think that the purchase price that was paid
21   and any valuations that were performed either by the
22   seller or the purchaser, the VR respondents, are
23   relevant to the various parties who were involved in
24   the procurement of award, the procurement of the
25   underlying contract, the facts and circumstances of
```

```
 1                        PROCEEDINGS              6
```

2  the arbitrations, the purchase price may well provide

3  information about their knowledge about the fraudulent

4  nature of the award.

5          For example, if the VR respondents acquired a

6  25 percent interest in an award that was worth on its

7  face amount $6.6 billion, and with, you know, rapidly

8  accruing interest, then that's now brought it over $10

9  billion, if they, for example, paid $100 million for

10  that large interest in a massive award, that would be

11  indicative of the fact that people involved in the

12  transaction, including the selling parties who were

13  the P&ID principals, that they had knowledge that the

14  award was invalid and procured through fraud and that,

15  therefore, would have a low probability of ultimate

16  collection.

17          It also is highly relevant to the fact that

18  there are parties in our view who stand to gain

19  massive profit here if they're successful in enforcing

20  the award, including the VR respondents, but also the

21  selling individuals who sold their interest in the

22  award to the VR respondents. And those ill-gotten

23  gains are relevant to the civil litigation that is

24  between the parties in England and for that reason we

25  think that the information regarding valuations and

```
 1                         PROCEEDINGS                    7
 2  the actual purchase price are relevant.
 3             There is a, you know, we can protect the
 4  information through the use of a protective order, you
 5  know, to the extent it's claimed that it's proprietary
 6  business information, but we think it's clearly
 7  relevant and, therefore, subject to production in this
 8  Section 1782.
 9             The second disputed scope of disclosure issue
10  relates to --
11             THE COURT:  I'm sorry to cut you off, Mr.
12  Major, but just I think it might be easier to just
13  address, like close the loop on this, this particular,
14  the valuation and purchase price issue, and then move
15  on to the second category.
16             MR. MAJOR:  Of course.
17             THE COURT:  Just because it's easier to keep
18  track.  Mr. Chivers or Mr. Rostow, do you have a
19  response on that?
20             MR. CHIVERS:  Thank you, Your Honor, Jeff
21  Chivers for the VR respondents.  This argument about
22  the valuation or purchase price paid by the VR
23  respondents is something that Nigeria raises before
24  Judge Engelmayer and he was unpersuaded by the
25  argument rightly so. It is extremely difficult to
```

PROCEEDINGS                    8

1

2  enforce and arbitration award against a sovereign that

3  does not want to pay which always leads to a discount

4  on any investment in them.  And moreover, Your Honor,

5  the still living co-founder of Process and Industrial

6  Development, Brendan Cahill, is a witness and

7  custodian in the English proceedings.  Nigeria knows

8  that Brendan Cahill was a party to the transaction

9  related to the investment because the VR respondents

10  in this case, and I'm sorry, the Schofield action,

11  produced a version of the shareholder deed which was

12  the instrument used for the investment.  So Nigeria

13  knows that Brendan Cahill was a party to that document

14  and if Nigeria truly believes this information is

15  relevant to the English proceeding, Nigeria would

16  bring the issue before the English Court as the Second

17  Circuit suggested in *In Re: Malev Hungarian Airlines*

18  which we cited at footnote 3 in our letter and there's

19  a case by this Court more recent in 2021, *In Re:*

20  *Porsche Automobil Holding SE*, and that's 2021 U.S.

21  Dist. LEXIS 115099 at 28 to 23, it's a 2021 decision.

22  And there the Court declined to order contested

23  Section 1782 discovery where the discovery in the

24  foreign proceeding itself.

25          We don't think this is a close call, we think

```
 1                      PROCEEDINGS                    9
 2   Judge Engelmayer was absolutely right when he said
 3   that the valuation is not a signifier of known
 4   criminality and to the extent the Court believes this
 5   is a close call, the fact that Nigeria can seek the
 6   same discovery from Brendan Cahill in the English
 7   proceeding with the judges or judge that is presiding
 8   over the English proceeding and will be making
 9   relevant determinations there, that should be a
10   deciding factor against ordering disclosure, as it was
11   in the In Re: Porsche case.
12            THE COURT:  Can I just ask you a question, Mr.
13   Chivers, the, you had said that, you had made a point
14   about arbitration awards are difficult to enforce
15   against a sovereign when they don't want to pay.  Was
16   that, when VR respondents was purchasing the 25
17   percent share in the award, was that something that
18   was already apparent that he Federal Republic of
19   Nigeria was contesting paying the award?
20            MR. CHIVERS:  It was easily discernible, Your
21   Honor, because there had been numerous conversations
22   before then about payment of much smaller amounts,
23   frankly, and Nigeria knows this.  There were numerous
24   discussions related to that and Nigeria has in the
25   past, I don't have the docket number in front of me
```

PROCEEDINGS                    10

1

2  but Nigeria has in the past resisted enforcement of

3  arbitration awards. And, in general, in foreign

4  sovereign debt markets, enforcement of arbitration

5  awards is notoriously difficult because the assets

6  typically to collect are within the sovereign itself.

7  So this kind of undertaking is an enormous

8  multimillion dollar undertaking regardless of whether

9  the award, itself, is tainted by fraud. And there is

10 no evidence that when the VR respondents invested

11 there was any indication that the award was tainted by

12 fraud, the VR respondents viewed it as an award that

13 had been entered in London and needed to be enforced

14 pursuant to the New York convention in jurisdictions

15 where Nigeria had assets. And, yes, it is exceedingly

16 difficult to obtain this kind of judgment.

17          THE COURT:  Okay, Mr. Major, do you have a

18 response to the point that you could obtain this

19 discovery from Mr. Cahill in the English proceeding?

20          MR. MAJOR:  Yes, Your Honor.  Regarding that,

21 Mr. Cahill is not a party to the English proceeding,

22 the party to the English proceedings is Process and

23 Industrial Development and Nigeria, Mr. Cahill is not

24 a party. There's not showing before the Court that

25 this discovery that we're requesting could be obtained

1
2  in the English proceeding. Even if it could, that
3  would not be a bar under Section 1782. I think most
4  importantly though, Your Honor, we're seeking
5  documents in the VR respondent's possession including
6  their internal valuations that they presumably
7  performed. It's one thing to say that an award like
8  this is difficult to enforce and, yes, maybe it will
9  cost at the end of the day tens of millions of dollars
10 to attempt to enforce it, but we're talking about an
11 award that is in excess of $10 billion and the
12 difficulty in enforcement may very well be something
13 that a shrewd investor like the VR respondents take
14 into account.  But if the valuation and the price paid
15 is, you know, a very small fraction of the overall
16 amount, that would be indicative of knowledge
17 regarding the fraud and the invalidity of the award.
18         Regardless, the argument about, you know,
19 whatever the Court thinks of the merit of that factual
20 argument about whether the purchase price would be
21 indicative of knowledge of the fraud, that's an
22 argument that will be presumably made in England. What
23 we're, the only thing we're seeking at this stage is
24 discover the facts and then it will be up to the now
25 king's counsel who will be arguing in the English

```
 1                         PROCEEDINGS              12
 2   trial how to deploy those facts.  You know, so the job
 3   we have here is to obtain the facts and I think that
 4   it's relevant, it's easy to produce, it can be
 5   protected by a protective order and it's valid
 6   discovery that is relevant to the claims that will be
 7   litigated in England. And, of course, P&ID will make
 8   whatever arguments it wants to make over there and our
 9   client will make its arguments and then the English
10   Court will decide. But right now we're just seeking
11   the discovery of easily obtainable documents that are
12   clearly producible under the Federal Rules which apply
13   here.
14            THE COURT:  So I guess I'm just, I'm
15   wondering, you say that this is clearly relevant and I
16   guess that's where I'm not entirely following your
17   argument. Is there, if they -- if there is no evidence
18   at the time that VR, that the VR respondents invested
19   in the, in a 25 percent stake that the award was
20   tainted by fraud, then why is it not just equally
21   plausible that any discount, if there was a discount
22   in the price, could have been attributable to various
23   other factors not (indiscernible) fraud?
24            MR. MAJOR:  Yes, Your Honor, so the only thing
25   we have when, you know, counsel says that there was no
```

```
 1                          PROCEEDINGS                 13
 2   evidence of fraud and that his clients did not have
 3   evidence of fraud at the time they purchased the
 4   award, the only thing we have is that representation
 5   from counsel. Without the documents we're not able to
 6   test that and discover these facts. I don't think
 7   that, you know, the representation from counsel about
 8   his client's knowledge should be sufficient for
 9   cutting off discovery.  You know, if we get these
10   documents it may well show, maybe they paid 75 cents
11   on the doll and, you know, everyone would conclude
12   that they paid full value given the difficulty of
13   enforcement.  But maybe they paid 5 cents on the
14   dollar and the two fraudsters who engineered this
15   thing from the beginning knew that they had a
16   fraudulent award and sold it for a song, so to speak,
17   because they knew that it wasn't worth much. And that
18   fact could be highly relevant in the English trial and
19   that's why we're seeking to discover it, not just
20   through a representation from counsel, but from
21   actually getting the source documents.
22            THE COURT:  Is this something Judge Engelmayer
23   already considered, was this type of discovery into
24   the valuation that VR respondents conducted before
25   Judge Engelmayer?
```

```
 1                       PROCEEDINGS                  14
 2              MR. MAJOR:  Your Honor, regarding Judge
 3   Engelmayer's comments during the April hearing, he was
 4   presiding over the 1782 that relates to the Nigerian
 5   criminal proceeding. He did react that he didn't think
 6   it was evidence of a crime if there was a discount
 7   paid, but that's not the issue that's before this
 8   Court now which is whether or not it's potentially
 9   relevant to the issues that will be tried in England.
10   And one of the biggest issues that's going to be tried
11   in England is whether the award was fraudulently
12   procured and, you know, whether the folks who procured
13   the award, you know, knew that it was fraudulent,
14   could be proven by a lot of facts, one of which could
15   be the amount that they sold it for.
16              So we maintain that Judge Engelmayer did not
17   consider the issue that's before this Court and, in
18   any event, Judge Engelmayer did not issue an order
19   barring even in that case us from obtaining this
20   information, he was just reacting on the record during
21   a hearing. But there was no, we weren't foreclosed
22   from pursuing it, but in any event, and I think more
23   importantly, the issues here in this Court are
24   different than what Judge Engelmayer was considering.
25   As counsel said in his argument today, that was, it
```

PROCEEDINGS                    15

1

2   was referring to whether there was criminality in the,

3   of the transfer of the interest in the award but

4   that's not what we're arguing here, it's really that

5   it's relevant to the knowledge of the fraud. And then

6   also, you know, most importantly for a civil case,

7   which is what the English trial is, that it's

8   demonstrative of the ill-gotten gains that the

9   fraudsters are pursuing.

10          THE COURT:  Mr. Chivers, I think you were

11  going to say something?

12          MR. CHIVERS:  Thank you, Your Honor.  First,

13  with respect to our position being based only on

14  representation of counsel, that's not right. In the

15  Schofield, the now Schofield proceeding, we've

16  produced documents from our due diligence file and we

17  have begun and will continue to produce documents from

18  the VR respondent's due diligence file. It's not just

19  a representation of counsel, we've, we are producing

20  documents from our due diligence file and Nigeria has

21  obtained broad discovery in multiple forums. They've

22  gotten discovery from us, from the VR respondents in

23  this and the Schofield case, wire transfer records

24  from banks, documents and information from numerous

25  cooperating and detained witnesses in Nigeria, and

PROCEEDINGS                16

there is no indication that the VR respondents had

knowledge of any possibility that the award was

tainted by fraud. It's not just a representation of

counsel, we also have been complying with discovery

and there is no indication that there was any such

knowledge.

As to Brendan Cahill --

THE COURT:  Sorry --

MR. CHIVERS:  Sorry, Your Honor.

THE COURT:  No, no, it's all good. When you

were saying you were producing documents in your due

diligence files and those, that you would say supports

your statement that there is no indication of fraud.

But just to get an example, when you say due diligence

files, what are we talking about?

MR. CHIVERS:  So the VR respondents maintained

a file related to the investment in P&ID, they have

referred to it as the diligence file in the sense that

they performed diligence on the investment before

making the investment. And that file has been the

subject of discovery in the Schofield action and this

one. In the Schofield action the VR respondents have

produced the non-privileged documents from that file.

So to the extent there were any evidence of fraud,

```
 1                        PROCEEDINGS                17
 2   that would have been produced from the due diligence
 3   file.
 4          THE COURT:  So, Mr. Major, why is the due
 5   diligence file not the information you need to show
 6   knowledge of the fraud.
 7          MR. MAJOR:  Your Honor, the diligence file is
 8   a file that the VR respondents selected to search, we
 9   have not in this proceeding started to receive the
10   emails from the various individual custodians. What's
11   been produced so far is from the share file and we
12   received I think a little over 500 documents so far
13   which is obviously nothing given a transaction of this
14   size. And the documents that were produced in the
15   matter that's now before Judge Schofield were just
16   from two custodians during the time period that was
17   selected by the VR respondents without our
18   consultation and that were selected, and the
19   custodians and search terms also were selected without
20   consultation for what we maintain was an engineered
21   search.
22          So and the transaction records that we
23   received so far, they're fully redacted and we have
24   not received any wire transfer documentation from the
25   VR respondents. We did receive it in a prior Section
```

```
 1                          PROCEEDINGS                    18
 2    1782 from third party banks which included bribe
 3    payments which were instrumental in the English
 4    proceedings and we'd like to get the transaction
 5    records here for the same reason.  It may well be,
 6    turn out to be instrumental in the English trial, this
 7    is an enormous case with enormous ramification for the
 8    country of Nigeria and we want to make sure that we
 9    pursue the discovery in the US that's readily
10    available from the VR respondents. If the VR
11    respondents, they're in this business, Mr. Chivers has
12    said, you know, it's a hard thing to collect on these,
13    they knew what they were in for when they purchased
14    their interest in this fraudulent award and I don't
15    see any reason why we shouldn't be entitled to receive
16    the documents so that we can consider to what extent
17    they will help the client prove the case. I don't see
18    how somebody could be trying to enforce an award, be
19    the respondent in an English set aside trial regarding
20    that award, but will not disclose anything about its
21    purchase of the award. It's clearly relevant, they
22    purchased an award that is being contested in England
23    and I think that purchase is highly relevant to the
24    validity of the award.
25              MR. CHIVERS:  Your Honor, Jeff Chivers for the
```

PROCEEDINGS                    19

1

2   VR respondents, just a couple of things with respect

3   to Mr. Major's statements that there was wire

4   transactions showing bribe payments. Those wire

5   transactions, which we would not concede show bribe

6   payments, they are not wire transactions of the VR

7   respondents, just to be clear. I think Mr. Major would

8   acknowledge that the wire transfers he just referred

9   to are not wire transfers of the VR respondents, they

10  were other individuals and they were from time

11  periods, again, before the VR respondents made their

12  investment.

13          And with respect to Brendan Cahill not being a

14  party to the English proceedings, I'm looking at the

15  list of individuals from whom documents were collected

16  and Brendan Cahill is on it.  He is a custodian in the

17  English proceeding and this really goes to the Second

18  Circuit's decision that we cited footnote 3 in the *In*

19  *Re: Porsche* decision where, you know, Nigeria is

20  saying in this proceeding give us the documents now

21  even though they are of doubtful relevance and they

22  are trade secrets and then we will use them in the

23  English proceeding when Nigeria still could have,

24  could have and could still go to the English Court and

25  say these documents are relevant, they should be

PROCEEDINGS                    20

 1
 2   within the scope of discovery, the English Court could
 3   give a ruling on that and get it from Cahill and if he
 4   won't give them up in the English proceeding then
 5   Nigeria could come here and say the English Court
 6   deems these relevant and they should be produced.
 7   That's exactly what the Second Circuit described as
 8   the right procedure in a close, if this is a close
 9   call, which we don't think it is, I think that's the
10   right procedure to handle it.
11           MR. MAJOR:  Your Honor, if I could just react
12   to the trade secrets point.  How could the VR
13   respondents possibly take the position that the
14   documents are trade secrets and yet tell us to go get
15   them from Brendan Cahill, they're not trade secrets.
16   And the *Porsche* case and the Second Circuit case,
17   those are not cases where parties were seeking
18   documents from, in those cases they were seeking
19   documents directly from someone who was subject to the
20   jurisdiction of the Court overseas. Here, you know,
21   we're seeking documents from the VR respondents who
22   are undisputedly found in this district. We want VR
23   respondents' documents, not Brendan Cahill's
24   documents. And they don't deny that they're in
25   possession of these records, they make no argument

```
 1                          PROCEEDINGS                    21
 2   that it would be too difficult to produce, they're
 3   just trying to keep it secret, and that's improper,
 4   we're entitled to the discovery and there are
 5   protections that could be put in place to the extent
 6   they claim it's proprietary information, but I don't
 7   see how they could possibly claim to the Court that
 8   they're trade secrets when they're also telling the
 9   Court that I can be obtained from an adverse party
10   like Brendan Cahill who they've initiated an
11   arbitration against. Which is another point we'll come
12   to but I just wanted to react to that trade secret
13   part.
14           THE COURT:  So, Mr. Cahill is the founder of
15   P&ID, correct?
16           MR. MAJOR:  Yes.
17           THE COURT:  So if what you're seeking is the
18   purchase price at which VR respondents bought the 25
19   percent interest, would his, would Cahill's documents
20   not show that?
21           MR. MAJOR:  I don't know what Mr. Cahill has
22   in terms of documents regarding the purchase price.
23   But it's not just the ultimate purchase price which
24   the VR respondents have not -- obviously have and have
25   not yet produced to us, but it's also internal
```

```
 1                        PROCEEDINGS                   22
 2   valuations and the information that was considered by
 3   the VR respondents when they determined what price
 4   they would pay for the award.
 5            THE COURT:  But the information they
 6   considered in determining what price to pay, I guess
 7   this circles back to my question of why this wouldn't
 8   come out of whatever they're going to produce to you
 9   from the due diligence files?
10            MR. MAJOR:  Well we think it should be what
11   they produce to us, whether it comes from the due
12   diligence files of the custodian emails. They advised
13   us during our extensive meet and confers that when
14   they're reviewing documents, if there are documents
15   relating to the valuation of the award, the
16   determination of the purchase price, they've told us
17   that they are withholding those documents.  So they
18   should be produced as part of that process but the
19   reason we're here is they told us unequivocally they
20   are not going to produce those documents when they
21   come across them.
22            MR. CHIVERS:  Your Honor, Jeff Chivers, may I
23   make a clarification with respect to the last thing
24   Mr. Majors said which is that we are withholding
25   documents related to valuation, that's not quite
```

PROCEEDINGS                         23

1
2   right.  What we have said is we're not going to
3   produce documents that relate purely to the valuation
4   and have no, have no relation to procurement of the
5   GSPA or procurement of the arbitration.  We have
6   committed to producing and we have been producing
7   documents that are related to the procurement of the
8   GSPA and the procurement of the award and I think 10
9   other subjects that Nigeria has asked for. What we've
10  said is if a document relates exclusively to a
11  valuation and it has no information related to those
12  other subjects that arguably and some of them, you
13  know, they are relevant, then we won't produce that.
14  It's not that we're withholding everything that
15  relates to a valuation.
16          THE COURT:  Okay, do we want to move on to the
17  second point?
18          MR. MAJOR:  Yes, Your Honor, the second point
19  relates to, and I've previewed this a little bit, this
20  is Chris Major for the record, documents related to
21  Process Holdings Limited, and its lawsuit against the
22  other P&ID shareholder, which is Lismore Capital. So
23  the way that the VR respondents invested in this award
24  is they set up an entity which we refer to in our
25  letter as PHL, which is Process Holding Limited, and

1
2   they used that entity as the investment vehicle so

3   that entity is the 25 percent, it's fully owned by the

4   VR respondents and it's the 25 percent member in P&ID.

5           It initiated an arbitration against the

6   selling party in the England and we've asked for

7   information concerning that arbitration. So after

8   purchasing the award, and after some developments in

9   the English Courts and presumably after the discovery

10  that we obtained from banks here in New York which

11  included in our view bribe payments by representatives

12  or affiliates of P&ID to in one case the daughter of

13  the Nigerian official who signed off on those

14  underlying GSPA agreements, after those events

15  occurred the VR respondents through their investment

16  vehicle, PHO, initiated an arbitration.  Obviously

17  they were making a claim against the selling party

18  that probably relates to the fraudulent nature of the

19  award and we've asked for information concerning that

20  arbitration proceeding. Obviously we're not entitled

21  and we're not seeking privileged information, but the

22  non-privileged information, to the extent it exists

23  regarding that award is relevant to, again, the

24  existence of a fraud and various actors' knowledge

25  about that. And for that reason we've asked for

```
 1                        PROCEEDINGS                    25
```

 2 discovery on that point and through our extensive meet

 3 and confers we've been advised that that information

 4 will be withheld and not produced to us.

 5          THE COURT:  Mr. Chivers?

 6          MR. CHIVERS:  Yes, Your Honor.  With respect

 7 to the internal shareholder arbitration, a few things.

 8 One is that there is no indication that the VR

 9 respondents performed some kind of external or

10 extrinsic investigation or analysis leading into that

11 shareholder arbitration. It was filed after a Court in

12 England held that there was a strong prima facie

13 showing of fraud. And that was very clearly the even

14 that precipitated the internal shareholder

15 arbitration. It does not indicate that the VR

16 respondents are in possession of some kind of

17 additional evidence beyond what's in the English

18 proceeding as the basis for that arbitration.

19          With respect to what the VR respondents have

20 produced or have said they will not produce, the

21 letter that Nigeria attached at ECF 53.1, which is a

22 letter from prior counsel for the VR respondents dated

23 August 31, 2022, lays out the approach that the VR

24 respondents have taken with respect to producing

25 documents from the internal shareholder proceeding.

 1

 2  And the VR respondents have said that, you know, they

 3  have, they are producing, and that production is now

 4  done in the Schofield action, relevant non-privileged

 5  attachments to the internal arbitration documents and

 6  the VR respondents have committed to producing any new

 7  non-privileged contemporaneous evidence concerning the

 8  fraud allegation submitted in the arbitration.

 9           In other words, the VR respondents have said

10  if there is anything in the internal shareholder

11  arbitration that constitutes evidence, you know,

12  facts, testimony, that is extrinsic to what was

13  already presented in the English proceeding, it will

14  be produced. And the VR respondents have made that

15  commitment. I'm not aware of anything else that needs

16  to be produced, which is -- which is I've asked them,

17  and I'm not aware of any additional documents to

18  produce.

19           So I'm not sure where there is to go on this

20  issue. I don't believe there are any additional

21  documents that need to be produced related to the

22  arbitration. I'm not sure what more Nigeria wants.

23           THE COURT:  Mr. Major, do you want to, I'm, I

24  guess I'm a little confused as to what exactly Nigeria

25  is seeking with this request?

```
 1                    PROCEEDINGS                 27

 2            MR. MAJOR:  Your Honor, so what we're seeking

 3   are all of the non-privileged documents relating to

 4   that arbitration and its filing.  The subject of the

 5   meet and confer, we were told that the, that they were

 6   not going to -- this was a contested scope issue that

 7   the VR respondents had taken the position even with

 8   prior counsel that the proceeding is irrelevant to the

 9   English trial and, therefore, they're not going to

10   produce them.

11            You know, if we have the commitment of the VR

12   respondents that they will, in fact, produce all of

13   the non-privileged documents relating to that

14   arbitration, that's obviously, you know, all we're

15   looking for, so if we can have that commitment then I

16   think we can put this issue aside. But we have not

17   previously understood, including from the letter that

18   counsel referenced, that they were going to actually

19   produce all of the non-privileged documents relating

20   to the arbitration.

21            From what counsel said today it sounds like

22   there is some, you know, some, you know, scope that

23   they're carving out, you know, on a unilateral basis.

24   I think, you know, unless they were to tell us that

25   there was some massive volume of documents relating to
```

PROCEEDINGS                    28

1
2    the arbitration, it should be simply all of the
3    relevant -- all of the documents concerning that
4    arbitration that are not privileged, we'd like all of
5    those documents produced. So that would be the
6    commitment that we would ask counsel to make on this
7    issue. And that could include, you know, copies of the
8    pleading, it could include discussions that are not
9    attorney-client privilege in emails and so forth.
10   Excuse me -- we obviously don't know the whole range
11   of what the documents are having simply haven't been
12   produced, but I would expect it to be a fairly limited
13   amount of documents given the relative recency of the
14   arbitration filing and obviously, you know, they're
15   entitled to and we expect them to withhold the
16   privileged documents.
17          MR. CHIVERS:  Jeff Chivers, Your Honor, just
18   to clarify what the VR respondents have committed to
19   produce because I think there may have been some
20   uncertainty expressed by Mr. Major.  The VR
21   respondents have committed to produce any non-
22   privileged evidence, not argument, not a statement of
23   argument that's made in the arbitration, but any
24   evidence that is distinct from what was presented to
25   the English Court in the English proceeding. And the

PROCEEDINGS                    29

VR respondents have also committed and have produced
attachments that are non-privileged in the internal
arbitration.

　　　　　So it's not correct that the VR respondents
have committed to produce everything related to the
internal arbitration because it is not accurate that
everything is relevant to whether the GSPA was
procured by fraud and wehther the award was procured
by fraud. The scope of the internal arbitration
proceeding is not limited to the issues that Nigeria
is asserting in the English proceeding, and we've said
with respect to the claims that Nigeria is asserting
in the English proceeding, if there is any evidence
related to those things that is not in the English
proceeding, itself, then it will be produced. That is
the commitment that the VR respondents have made and I
think as we stated in the August 31st letter at ECF
53.1, that should be sufficient. We don't see why
additional documents would be relevant to the English
proceeding or should be produced.

　　　　　THE COURT:  When, Mr. Chivers, when you say
evidence, not argument that is distinct from what was
produced in the English proceeding, are you, are you
basically saying that if you've already given it over

1

2   in the English proceeding you are not turning it over.

3   But to the extent it's all non-privileged relating to

4   the arbitration, you are committing to produce it?

5          MR. CHIVERS:  It's the, so, Your Honor, the

6   documents, themselves, as Mr. Major described, I

7   haven't seen all of them, but there would be filings

8   made in connection with the arbitration and some of

9   those filings would be statements of legal argument,

10  some of those filings could be evidence, evidentiary

11  material. And what the VR respondents have committed

12  to produce is any evidentiary material that was not

13  taken directly from the English proceeding because the

14  VR respondents, well not the VR respondents but an

15  affiliate, filed the internal arbitration based upon

16  an English Court finding a prima facie case of fraud.

17         And we've committed that if there were, if

18  there were any other evidentiary material other than

19  what was already in the English proceeding, then we

20  would produce that.

21         THE COURT:  Okay, but you wouldn't be

22  producing -- so I guess in your mind what's excluded,

23  like if there was a brief or some motion argument,

24  stuff of that nature is not getting turned over?

25         MR. CHIVERS:  Not under the current

PROCEEDINGS                 31

1

2  commitment, Your Honor, that's correct.

3          THE COURT:  And, Mr. Major, why would you need

4  the stuff of that nature, so legal arguments, briefs,

5  et cetera?

6          MR. MAJOR:  Well, Your Honor, for example, the

7  statement of claims in that arbitration, if the VR

8  respondents are making allegations of fraud against

9  their partner and the investment of the award, I think

10  that that's relevant. They presumably, PHL, the

11  claimant, had a, has a basis for making those

12  allegations and the basis, you know, might be revealed

13  through the pleadings.

14          I haven't heard any arguments from the VR

15  respondents as to any prohibition on them producing

16  these documents and I don't know what stage the

17  arbitration is. It sounds to me, because Mr. Chivers

18  said they're going to produce evidence from that

19  proceeding but he's unaware of any such document

20  production that they'll ever make, which tells me the

21  VR respondents know that the arbitration has not yet

22  advanced to the stage where evidence is given, but

23  there are other documents and it might even include

24  emails. There might be a demand letter.  There might

25  be things that contain allegations relative to the

1

2   fraud. I don't see and have not heard any specific

3   argument, as to how there could be anything in that

4   arbitration that would not be relevant to the overall

5   fraud that's at issue in the English set aside trial,

6   after all, the only business of P&ID is the

7   prosecution of this fraudulent award.  VR respondents

8   made an investment through investment vehicle PHL in

9   that award and is suing its partner over that

10  investment. So it's certainly, and counsel has

11  indicated today that the reason the arbitration was

12  filed is because the English Court found a strong

13  prima facie case of fraud, that's what triggered the

14  arbitration filing.

15          So, obviously, that arbitration concerns that

16  fraud, and we are entitled to everything that is non-

17  privileged. I don't, other than for some tactic, I

18  don't see why the VR respondents are trying to, you

19  know, divide materials from that proceeding into

20  evidentiary and non-evidentiary and why they would be

21  concerned about showing their legal arguments which

22  may well be, and pleadings and things like that, those

23  things could be highly relevant. But there also may

24  be, and counsel has not spoken to this yet, but there

25  may be communications about the arbitration, whether

```
 1                      PROCEEDINGS                    33
 2  with third parties or non-privileged internal
 3  communications, which I think we're entitled to see
 4  under Section 1782 and shouldn't be that difficult for
 5  the production to be made.
 6            But I don't think that the unilateral
 7  commitment that they're trying to set forth is
 8  sufficient because it clearly is cutting off relevant
 9  documents from an arbitration that is centered on the
10  same fraud that the English trial is centered on.
11            MR. CHIVERS:  Your Honor, Jeff Chivers for the
12  respondents. I don't agree at all that there is any
13  indication that we are drawing some artificial line to
14  exclude problematic documents.  The line, what we're
15  saying is that the arbitration was based on the
16  findings of an English Court. I mean Mr. Major I
17  believe expressed that there must be some basis for
18  the arbitration but the basis is not that hard to
19  define. An English Court found a prima facie case of
20  fraud by the sellers of an interest in P&ID, not with
21  respect to the selling of the interest in P&ID but
22  with respect to the procurement of the GSPA and the
23  award.
24            And the privilege issues here are complicated
25  and they are very complicated privilege issues because
```

PROCEEDINGS                              34

the arbitration, itself, is confidential, it's seated

in London subject to London attorney work product and

litigation advice privileges which are distinct and

significant ways from the US attorney work product and

attorney-client privilege. And what Nigeria is asking

us to do is go through all of the files and make

privilege determinations under four different

doctrines of law related to documents that don't have

any relevance to the English proceeding.  Because if

it's just an argument made by the VR respondents based

on what has already been filed in English proceeding,

that isn't that isn't relevant. I mean the documents

need to be evidence in order to be relevant to the

English proceeding.

        And so the commitment we're making is if there

is any such evidentiary material we will give it,

which dramatically reduces our burden and the fights

over, over privileged and legal argument.

        THE COURT:  Mr. Chivers, I guess to the point

of the privilege and I'll admit I don't know anything

about privilege law in English proceedings, but I'm a

bit confused as to, and maybe they just have a

different approach of privilege, but if Mr. Major is

seeking, like he gave examples of like a demand letter

PROCEEDINGS                    35

1

2   or statement of claim, if that's filed in the

3   proceeding there is still some argument that that

4   could be privileged?

5           MR. CHIVERS:  I believe so, Your Honor, as I

6   understand it with respect to without prejudice

7   communications, similar to FRE 408 under US law, but

8   broader as we understand that.  That's with respect to

9   something like a demand letter, Your Honor. I would

10  need to, if that's the kind of communication that Your

11  Honor believes could be discoverable, I think I would

12  need to go back and look at the English privilege on

13  them.  My understanding is that the scope of the

14  English without prejudice privilege is broader than

15  FRE 408, for example. And with respect to the

16  arbitration, itself, the English privileges can cover

17  documents that are filed even in the arbitration,

18  itself, because they're documents that are as between

19  two parties who have a common interest with respect to

20  the alleged, the fraud that's alleged by Nigeria. So

21  we have to look at the, we have to look at every

22  document and consider, you know, who filed this

23  document and does it constitute waiver of a privilege

24  because it was disclosed to the counterparty in the

25  arbitration. And the answer to that is not always yes

```
 1                           PROCEEDINGS                    36
 2   because it can be documents that are, nonetheless,
 3   subject to a common interest, notwithstanding that
 4   there's a dispute within that overall scope of what is
 5   covered by the privilege.
 6            THE COURT:  And just to understand the burden
 7   of such a review, I don't know how far along you are
 8   in this arbitration proceeding but do you have a sense
 9   of how many documents you're talking about?
10            MR. CHIVERS:  It's I believe not a massive
11   number of documents. I don't know the exact status of
12   the arbitration other than that it is currently stayed
13   and it had been stayed for some time. This s not an
14   issue that I looked as closely at as the other issues,
15   to be candid, because it was, it was raised rather
16   late in the meet and confer discussions, and Mr. Major
17   can correct me if I'm wrong on that, but this issue
18   came up I think only in the week that Nigeria filed
19   the motion to compel whereas the other issues have
20   been crystalizing over a period of a week or two.  I
21   don't know exactly the number of documents, I think it
22   is, you know, less than -- less than 2,000 documents I
23   would estimate based upon what I understand of the
24   status.
25            THE COURT:  Okay.  And then just --
```

```
 1                          PROCEEDINGS              37
 2              MR. MAJOR:  Your Honor, I can speak to that.
 3   Prior counsel for the VR respondents, just issue has
 4   actually been percolating for some time and we've been
 5   discussing it with Mr. Chivers but also his
 6   predecessor counsel, the predecessor counsel told us
 7   there were 35 documents filed in the arbitration by
 8   the parties.
 9              MR. CHIVERS:  I'm looking at that now, Your
10   Honor, and I just, I didn't want to say, I didn't want
11   to say a number that is inaccurate, that it's
12   definitely less than 2,000.  According to the letters
13   here at 53-1, there are 35 documents that were created
14   in connection with the arbitration exchanged between
15   the parties.  And there's a further description of why
16   those documents are not relevant and later on at page,
17   on page 2 of that August 31st letter is the commitment
18   to produce any evidentiary material.
19              THE COURT:  So is the issue then just really,
20   if predecessor counsel is correct that the number of
21   documents is 35 and you've agreed to produce all non-
22   evidentiary -- or all evidentiary materials that
23   weren't already produced as part of the English
24   proceeding, then are we really just talking about 35
25   documents?
```

```
 1                        PROCEEDINGS                    38
```

 2          MR. CHIVERS:  I think it's possible, Your

 3   Honor, and I would need to go back to the repository

 4   and confirm that.

 5          THE COURT:  Okay. And then I just wanted to

 6   ask one more thing about, more targeted towards the

 7   relevance of the documents, if the arbitration was

 8   filed because the English Court made a finding of

 9   fraud then Mr. Major had indicated that things such as

10   like the statement of claims or the demand letter

11   could contain allegations relevant to the fraud. And I

12   just wasn't, I wasn't clear what your position was on

13   why that wasn't relevant?

14          MR. CHIVERS:  Well, Your Honor, it's not

15   relevant in the same way that we don't do a relevance

16   analysis of legal briefs that are filed in US court,

17   it's not evidentiary material. And unless it refers to

18   evidentiary material or facts that are extrinsic to

19   the English proceeding, it is a totally derivative

20   action. And the way we see it really is, it is a

21   litigation about a litigation about a litigation, it's

22   derivative to the second degree with respect to

23   whether the GSPA was procured by fraud and whether the

24   award, itself, was procured by fraud.  And allegations

25   with respect to disclosures, for example, by the

```
 1                          PROCEEDINGS                39
 2  sellers of the interest in P&ID to the VR respondents
 3  really don't have any relevance to whether there was
 4  fraud in the GSPA or fraud in the award. And legal
 5  arguments about those things as in whether, whether
 6  the English Court's finding of a prima facie case of
 7  fraud is sufficient to be a breach of some kind of
 8  contractual guarantee just is derivative of and has no
 9  relevance to the underlying factual circumstances.
10          THE COURT:  So actually that, that makes sense
11  to me so I just, Mr. Major, if you just want to
12  respond to that point because I was persuaded when Mr.
13  Chivers said that, you know, typically legal arguments
14  made in briefs are not really relevant to the
15  underlying factual issues and so if you had a response
16  to that.
17          MR. MAJOR:  Sure.  So I think the problem with
18  that construct is Mr. Chivers is, or his clients are
19  looking at these 35 documents and telling us I'll give
20  you what is evidentiary or factual, I won't give you
21  the legal arguments, but then he's also told us that
22  he has, he knows of nothing he is going to give us.
23  Which means they have determined or selected the
24  position that all 35 documents that they've conceded
25  are filed in that arbitration, that they only contain
```

PROCEEDINGS                    40

1

2    legal argument and not anything else. Which I think is

3    impossible.

4           The statement of claims is allegations. The

5    allegations that are made concern the fraud and I

6    think that those allegations are certainly relevant.

7    The fact that the party prosecuting this award and

8    seeking to enforce it in multiple jurisdictions that

9    they are infighting over the fraudulent nature of the

10   award is very much relevant to, again, the knowledge

11   of the parties and there might be allegations in that

12   statement of claim that, you know, reveal specific

13   facts relating to the fraud or the facts and

14   circumstances surrounding any step of this, you know,

15   long, ongoing fraud which is continuing to this day

16   with the efforts to enforce the award.

17          So I don't see why certainly the allegations,

18   the equivalent of the, of the, you know, the response

19   to the statement of claim, those types of things are

20   pleadings, not legal argument in a brief. But, again,

21   even if there are legal arguments, if there has been

22   any substantive briefing, I don't see why the, it's

23   not a question of admissibility at this stage, it's a

24   question of whether the information is relevant and

25   whether there's some undue burden on the party making

PROCEEDINGS                    41

1

2  the production. But I think that our client is

3  entitled to see the allegations that are being

4  exchanged between the two parties that are seeking to

5  enforce this massive award against our clients.

6        So I don't think it's fair to allow one side

7  to just dictate the scope of the disclosure by, you

8  know, drawing a line and then it determines in its

9  sole discretion whether something is going to be

10 couched as being legal argument and I think counsel

11 has taken the position today that a statement of claim

12 is a legal argument and is not, you know, the, like a

13 pleading would be in any arbitration or in any

14 litigation.  So we already know how they're going to

15 construe everything but het the Court and Nigeria

16 never get to see it, I don't think that that's fair.

17 And I don't think that the arbitration, there's no

18 argument that the arbitration doesn't concern the

19 fraud, in which case I think the relevance is

20 established and if there is some privilege that

21 attaches to one of the documents, well that's easy,

22 that's something then they'll put it on a privilege

23 log.

24        But the reason this is in our letter and we're

25 arguing about it now is because they've told us

```
 1                      PROCEEDINGS                42
 2  they're not going to give us any of these documents,
 3  whether they're privileged or not. So I think the
 4  privilege issue is a red herring because we have not
 5  said that they're not entitled to assert the relevant
 6  privileges, we never got there because they told us
 7  that they wouldn't give us the documents.  And so it's
 8  really a categorical objection on their part, not a
 9  genuine assertion of privilege.
10          MR. CHIVERS:  If I could, Your Honor, with
11  respect to -- I believe there's a little element of a
12  suggestion that the VR respondents are drawing their
13  own lines in a way that's inappropriate or
14  unreasonable. I don't think there's any evidence of
15  that, we're being very forthcoming about what we would
16  produce and what we've committed to produce and what
17  we would not produce. I don't think this is a
18  suggestion that we're doing that in an improper way.
19  And to the extent that the Court is persuaded by
20  Nigeria that the Court should make a determination as
21  to whether these documents that we're describing as
22  non-evidentiary nonetheless need to be produced, I do
23  think that an in camera review would be, could be an
24  appropriate way to handle those documents.
25          THE COURT:  Mr. Major, when you describe, for
```

1
2  instance, the statement of claims, would that be
3  equivalent to like a complaint in a civil proceeding
4  here in the United States?
5          MR. MAJOR:  As we understand it, it's filed
6  with an arbitration tribunal, so I think it would also
7  be like a statement of claim that a party files, for
8  example, in JAMS or a AAA arbitration in the US, but
9  it serves the exact same function as a complaint in
10 the sense that it's the allegations, factual
11 allegations pursuant to which the claimant maintains
12 it has a cause of action against the respondent, and
13 then the respondent has to respond to that with its
14 allegations and I don't know if there are
15 counterclaims in that arbitration or not, but there
16 could be multiple rounds of pleading if there are. But
17 that's right, Your Honor, the statement of claims
18 should look a lot like a complaint looks in the US or
19 statement of claim in the US arbitration.
20         THE COURT:  And Mr. Chivers, when you were
21 proposing the in camera review, if this presumably you
22 would look at the 35 documents, figure out if there is
23 any privilege you can assert as to any number and then
24 have me review the ones that you are not asserting a
25 privilege for?

```
 1                        PROCEEDINGS                44
 2          MR. CHIVERS:  That was the suggestion, Your
 3   Honor, although I will say I thought of the procedure
 4   on the fly in the hearing. So if there's another
 5   better way to do it, certainly we're amenable to that
 6   as well.
 7          THE COURT:  And I would be reviewing them
 8   simply to look at whether they would be relevant to
 9   the English proceeding, so I wouldn't be conducting
10   any type of privilege review.
11          MR. CHIVERS:  That was our proposal, Your
12   Honor.
13          THE COURT:  Mr. Major, do you have any
14   objection to that?
15          MR. MAJOR:  Your Honor, we certainly don't
16   have an objection to an in camera review, as long as
17   our arguments stand for the Court's consideration that
18   we do think we're entitled to those filings in the
19   arbitration. And the other thing is I would just ask,
20   just given the urgency of the situation, that the
21   Court direct counsel for the VR respondents to make
22   that submission to the Court as soon as possible given
23   the fact that it's 35 documents that they segregated
24   and had collected quite some time ago because they
25   wrote to us about it in the summer.  So if that, if
```

```
 1                          PROCEEDINGS                    45
 2   that part of the process, meaning the VR respondents'
 3   submission to the Court could happen right away, we
 4   would be appreciative of that and then obviously it
 5   would be subject to the Court's availability to do the
 6   review. But we certainly wouldn't object to the Court
 7   also being able to see the documents, we would like
 8   our arguments to stand for your consideration and for
 9   them to, hopefully our client ultimately getting the
10   documents.
11          THE COURT:  Okay, so let's, on this second
12   point let's do that. I'd like to just take a look at
13   the documents that after Mr. Chivers has reviewed the
14   35 or so for privilege and taken out the privilege and
15   then whatever is left I'll take a look at them.  Mr.
16   Chivers, how much time do you need to do that?
17          MR. CHIVERS:  I think by the end of the week
18   would be difficult but early next week is doable.
19          THE COURT:  So if you -- if you can get them
20   to me, if you can get them to me by November 7th I can
21   commit to get them out, November 11th is a holiday so I
22   wouldn't be able to issue, I don't think there's any
23   docketing for orders, but I could get an order out by
24   November 14th.  Does that timeline work for everyone?
25          MR. CHIVERS:  It does for the VR respondents,
```

1

2   Your Honor.

3           MR. MAJOR:  And yes, Your Honor, for the

4   applicants. The deadline for document production in

5   the case is the 30th of November. And as I mentioned at

6   the top of the call, we're running a little bit behind

7   as we've only gotten about 500 documents or so in the

8   initial couple of productions that have been made and

9   we haven't gotten to the meat of it in terms of the

10  individual custodians' emails. But as long as Mr.

11  Chivers can receive Your Honor's ruling on the 14th,

12  and we certainly appreciate the Court acting so

13  quickly, and make whatever production comes out of

14  that, you know, within the current schedule, then we

15  certainly have no objection to that and appreciate the

16  Court prioritizing.

17          THE COURT:  Okay, I think that's feasible as

18  long as, you know, we're talking about, you know, 35

19  or so documents, give or take, if Mr. Chivers does his

20  review and then all of a sudden we have a significant

21  greater number then, you know, we might have to

22  discuss another timeline. But I can certainly commit

23  to getting an order out by November 14th on that.

24          I just wanted to circle, circle back to the

25  first category of documents.  When, I think this was

```
 1                       PROCEEDINGS                    47
 2  Mr. Chivers talking about documents that exclusively
 3  pertain to valuation with no information regarding the
 4  GSPA, it might have been someone else who mentioned
 5  this --
 6            MR. CHIVERS:  I believe that was me, Your
 7  Honor.
 8            THE COURT:  Okay, I'm just trying to get a
 9  sense of exactly, like if it was an example of what
10  type of documents we're talking about. And I'll be
11  perfectly candid here, I know, Mr. Major, you've
12  argued that this is relevant, I'm, to be candid I'm
13  struggling to see how it's relevant given that there
14  is various, there's a multitude of reasons why the,
15  why VR respondents could have paid what they paid for
16  the award that doesn't, that isn't necessarily
17  indicative of a knowledge of fraud.
18            So if you, like I'm -- if you want to come at
19  it in a different angle or spell it out for me, I
20  might not be seeing something that's obviously so you
21  should feel free to walk me through the argument again
22  --
23            MR. MAJOR:  Sure.  So let me start by taking
24  it from a different angle that maybe I didn't
25  emphasize enough. So the allegations in the English
```

```
 1                      PROCEEDINGS                    48
 2  trial include the fact that Mr. Quinn and Mr. Cahill
 3  and several others working with them, that they
 4  fraudulently procured the contract, fraudulently
 5  procured the award and then have been, Mr. Quinn is
 6  deceased but the others have been since fraudulently
 7  and unlawfully attempting to enforce the award.
 8           The sale of the award is part and parcel of
 9  the fraud. It shows how much money so far the
10  fraudsters have proceeded in gaining because VR
11  respondents presumably paid a substantial sum of
12  money, you know, whether that be $100 million, $1
13  billion or $10 million, there's some substantial sum
14  of money that was, of course, paid by the VR
15  respondents to the original fraudsters and that is
16  evidence that is relevant in the English set aside
17  trial and relevant to the overall fraud. The fact that
18  the fraudsters have, you know, succeeded already in
19  liquidating their ill-gotten and fraudulent
20  arbitration award, at least in part.
21           The other point, Your Honor --
22           THE COURT:  Let me ask you, you know they sold
23  it so like there is no dispute that the fraud, the
24  alleged fraudsters or fraudsters, Mr. Cahill and
25  whoever else, sold the award. So the sale, when you
```

PROCEEDINGS                    49

say the sale of the award is part and parcel of fraud,
it would only be part and parcel if you had, and I
guess this is what you are trying to get at, but if
you had evidence that the VR respondents were in on
it, that they knew that the award had been procured
fraudulently. But just the sale, in and of itself,
couldn't necessarily be part of the fraud if VR
respondents didn't have that knowledge.

          MR. MAJOR:  Your Honor, I guess my response to
that would be that not every fact in a case is in
itself dispositive. And it may be that the English
judge, if and when this argument is made, says I don't
care that VR respondents only paid $100 million for a
$10 billion award, that doesn't persuade me that they
or the sellers, you know, Mr. Cahill, even though he
wasn't a direct selling party, but the folks who were
100 percent in control of the award before selling 25
percent to the VR respondents, it doesn't prove to me
that they knew what they were selling was a fraudulent
award, I'm not persuaded by it.

          That might be what the outcome is, but that,
it's a different test that at the discovery stage
which is can we see what the number is. Because I
think, myself, that if somebody pays 1 percent of the

1                              PROCEEDINGS                    50

2    amount of an award, that to me, if I were, for

3    example, a juror, would be persuasive that somebody

4    knew something about the invalidity of the award. You

5    may think different and counsel for the VR respondents

6    may think differently, but I think that it's at least

7    a possibility that that fact, especially when you

8    couple it together with, for example, evidence of

9    bribes and confessions about the bribes and about how

10   this was done, the evidence which the English Court

11   has already credited that Mr. Quinn lied to the

12   arbitration panel in order to procure the award. The

13   improper conduct of counsel in the arbitration.  All

14   those kinds of things when you put them all together,

15   and then if you also put on top of that that the, you

16   know, fraudsters were able to, you know, get for a

17   very substantial sum, whatever that number is, pay for

18   it, and the VR respondents paid next to nothing for

19   it, let's say, I think all of those facts together

20   could go to show that the parties who are prosecuting

21   this award and seeking to enforce it, which includes

22   the VR respondents who we understand are the lead and

23   25 percent owner, that it's a fact that definitely

24   could point to the existence of the fraud and could be

25   beneficial to the arguments being made in the English

PROCEEDINGS                    51

1

2   set aside trial.  But it also does show how the

3   fraudsters have so far succeeded in liquidating the

4   fraudulent award.

5          So I think, again, Your Honor, I don't think

6   the test for the Court is to determine wehther the

7   potential facts that may come from that disclosure,

8   you know, whether it's persuasive to the Court about

9   the existence of the fraud, particularly just on its

10  own, but really whether it's relevant. And I think

11  that it's clear that when the main issue in the

12  English set aside trial is the fraudulently procured

13  award, transactions concerning that award are relevant

14  and are discoverable and there hasn't been really any

15  argument by the VR respondents as to why they

16  shouldn't produce it. It's something that could easily

17  be collected and produced, it's not going to be a high

18  volume of documents and it's something that can be

19  protected through the use of a protective order.

20         And so I think for all of those reasons, and

21  we're only at the discovery stage, I think that

22  production would be appropriate and that we're

23  entitled to it.

24         THE COURT:  Mr. Chivers, for these valuation

25  documents, do you have a sense of the volume of what

1

2   we're talking about?

3          MR. CHIVERS:   The volume of documents related

4   to the purchase price specifically, I mean the

5   purchase price is a piece of information that is

6   contained in documents related to the investment

7   transaction that are before the English Court.  And,

8   again, I think Mr. Major is getting the sequence of

9   events out of line with what we understand to be the

10  appropriate sequence under the Second Circuit law that

11  I cited earlier and this Court's decision in *In Re:*

12  *Porsche.*  Which is if the English Court and if Nigeria

13  really believes this post-award transaction is somehow

14  relevant to whether in 2010 the GSPA was procured by

15  fraud or in 2017 the award was procured by fraud, it

16  has had the opportunity and still has the opportunity

17  to ask the English Court to say so and get the

18  document showing the purchase price from Brendan

19  Cahill who is a custodian in the English proceeding.

20          We have made several arguments as to why it's

21  not relevant, I don't know why Mr. Major said we

22  haven't presented any argument for that, I don't think

23  that's accurate. And with respect to the trade secret

24  argument Mr. Major made earlier, the purchase price,

25  itself, can be a trade secret even though it is known

```
 1                        PROCEEDINGS                    53
 2   by both counterparties. Transactions that are subject
 3   to confidentiality occur all the time and just because
 4   a transaction is known by counterparties does not lead
 5   to a waiver of what is trade secret and confidential
 6   information.
 7            And we still just, again, Your Honor, don't
 8   see how this could be something that Nigeria can come
 9   into a US Court to get when the counterparty to the
10   transaction is before the English Court.  If they
11   really believe this is relevant, which we don't think
12   it is, and there is prejudice to having to disclose
13   this kind of confidential information, then Nigeria
14   should present that to the English Court and get a
15   ruling. And if the English Court believes it's
16   relevant then we would have to produce it.
17            THE COURT:  Okay.  And, Mr. Chivers, you have
18   said you were relying on the Second Circuit's decision
19   in this case and then I think you had cited one other
20   case, is it in your letter?
21            MR. CHIVERS:  Yes, it's not in the letter,
22   Your Honor, it's In Re: Porsche Automobil Holding SE,
23   it's 2021 U.S. Dist. LEXIS 115099 at 20 to 23, that's
24   a decision by the Court of June 21, 2021.
25            THE COURT:  Okay, so I'm going to just, I just
```

PROCEEDINGS                      54

1

2   want to look back at the transcript before Judge

3   Engelmayer and I'll look again at the Second Circuit

4   decision and this *Porsche* case.  So on this call I

5   won't be able to give you a decision on this first

6   point but I will, I won't take long to issue just a

7   quick written order.  So then I think there's still

8   the third issue in Nigeria's letter, but if we could

9   just hold on a minute

10          MR. MAJOR:  Sure.

11              (PAUSE IN PROCEEDING)

12          THE COURT:  Okay, so sorry about that.  So the

13  third issue, Mr. Major?

14          MR. MAJOR:  Yes, Your Honor, if I could beg

15  the Court's indulgence just on the last point. The

16  Second Circuit, and Your Honor will see this in the

17  case and in the cases that, you know, the Second

18  Circuit decision in the *Nigeria* matter, but also I

19  mean literally for the last three decades the Second

20  Circuit has made clear that Section 1782 imposes no

21  exhaustion requirement. We're not required to go get

22  documents elsewhere.

23          I think just from a factual standpoint, just

24  to make sure the record is clear, Mr. Chivers points

25  to the actual purchase agreement that he says Mr.

PROCEEDINGS                    55

Cahill is in possession of.  Even if this Court were

to impose and exhaustion requirement, which is

contrary to Second Circuit precedent, we're not

looking, we're not asking the VR respondents for Mr.

Cahill's documents, we want their documents.  And

their documents are going to include more than just a

number and a contract, they're going to include their

own internal deliberations and information concerning

the value of this award and what price they should

pay. And there's been now showing at all by the VR

respondents that that would be tantamount to a trade

secret under, for example, The Uniform Trade Secrets

Act.

          So I just wanted to make sure that it was

clear on the record what, what's at issue in terms of

our request, and we do not want Mr. Cahill's

documents.

          But the third point in the scope, and this is

--

          THE COURT:  I'm so sorry to cut you off, Mr.

Major, but since you said something that prompted a

question, if you don't mind.  So you want more than

just the price paid for the transaction because

presumably, or for the award, presumably the price you

PROCEEDINGS                    56

could get from Cahill.  To the extent you want the

internal deliberations that led to whatever price VR

respondents paid for it, you think that's not going to

come out of the diligence files that they're already

searching and producing documents for?

MR. MAJOR:  I think that it should but they've

told us they will not produce those documents that

include valuations. So it probably would be in the

diligence file, it's probably also attached to emails

of the various custodians, but it's the, you know, it

probably is in that diligence file which they told us

they're not going to give it to us and that's why we

raised this scope issue among the three for the Court

to consider.

THE COURT:  Okay, I, now that's clear in my

mind.

MR. CHIVERS:  May I clarify a couple of

points, Your Honor?

THE COURT:  Sure.

MR. CHIVERS:  This is Jeff Chivers for the VR

respondents. With respect to whether there's an

exhaustion requirement, that's not our argument, that

the Second Circuit has said there's no exhaustion

requirement, that's true. But the *In Re: Porsche*

PROCEEDINGS                    57

decision, nonetheless, clarifies that even if there's

not an exhaustion requirement, the fact that the party

can and has chosen not to get the document from the

foreign tribunal that's presiding over the proceeding

is a significant factor in whether to grant the

discovery demanded. And in a close call, which we

still think, you know, maybe Your Honor thinks this is

a close call and we think that the Second Circuit and

the *In Re: Porsche* decision provide a clear answer to

a close call like this, which is Nigeria should make

this argument to the English Court and if the English

Court thinks the documents are relevant, Nigeria can

get them then.

          With respect to VR valuations, it sounds like

Nigeria wants more than just the purchase price. The

purchase price they can get from Brendan Cahill in the

English proceeding if the English Court believes

that's relevant.  With respect to valuation I did say,

and just to clarify again, you know, to the extent any

documents relate to valuation of the investment in

P&ID or the award and they relate to the underlying

circumstances of the procurement of the GSPA or the

arbitration proceedings that led to the award, then

those would be produced because they are responsive to

PROCEEDINGS                    58

the procurement of the GSPA and the procurement of the

award.

          But if it's a document that just discusses

valuation because of overall credit markets or

Nigeria's creditworthiness, or the assets that Nigeria

has in jurisdictions that will recognize enforcement,

or a document that just has the valuation and is

discussing how to account for it, for example. I mean

there's, this I a hedge fund, you know, they talk

about investments without talking about the underlying

circumstances of something like this. And our point is

that the information of how a hedge fund values and

investment in the global credit markets is really

useful information to the outside world, it is a trade

secret. I mean this is the kind of knowledge capital

that hedge funds develop in how to evaluate an award

like this in the context of the overall global credit

markets and that just isn't relevant at all to whether

the GSPA was procured by fraud or the award was

procured by fraud.

          If there is something that relates to a

valuation based on, you know, the procurement of the

GSPA or based on the arbitration proceedings that led

to the award, we would produce those because they're

1

2  responsive to other categories that we've agreed to

3  produce.

4         THE COURT:  Okay, so that's, that was very

5  helpful.  Mr. Chivers -- Mr. Majors, if they're going

6  to produce the valuation documents that relate

7  specifically to the procurement of the GSPA, what's

8  your argument for the category of valuation documents

9  that Mr. Chivers identified which would just be

10  identifying things such as Nigeria's credit risk, et

11  cetera, that would not really pertain or discuss the

12  GSPA or the arbitration proceedings?

13         MR. MAJOR:  Your Honor, again, it's very

14  difficult for us to be stuck in the dark on these

15  things.  Mr. Chivers is making, I don't know if he's

16  representing to the Court that he's reviewed these

17  documents and that's what they say, or if he's

18  speaking hypothetically just because his client is a

19  hedge fund and that's what his general understanding

20  is of what hedge funds do.

21         What we've asked for are the documents

22  relating to the valuation of this particular award,

23  we're not interested in their institutional knowledge

24  and how they would do this in a future situation or

25  anything like that.  We want to see the value that

1                          PROCEEDINGS                    60

2   they placed on this very award and it's, I don't think

3   it's sufficient for counsel just to make a couple of

4   general statements about what might exist and then

5   they get to make the call about any visibility, about

6   whether in their view the valuations that they have in

7   their documents here in the US, and I'd just like to

8   cite the Court to the case *In Re: Topps Matrix*

9   *Holdings*, three words, *Ltd.* and it's 2020 WL 248716.

10  That makes very clear that contrary to the *Porsche*

11  case where the documents were, that were being sought

12  were in the possession of a German subsidiary involved

13  in litigation over there, the test in the *In Re: Topps*

14  *Matrix Holdings* case alludes to this or holds this,

15  the test is whether the documents are here in the US

16  and there is no denial that they're here in the US.

17          But we want the valuation documents. If there

18  are documents that counsel maintains are sensitive and

19  deal with credit markets and things like that, I think

20  that that's something that could probably be handled

21  with an in camera review if that really is the

22  concern.  But my concern here is that there is going

23  to be across the board no productions relating to the

24  valuations on the grounds that it all is, you know,

25  secret information and goes to their methodology and

1                              PROCEEDINGS                       61

2  doesn't say, you know, something that fits into one of

3  the other categories. This is one of the categories

4  that we want production on and they can't point to Mr.

5  Cahill and say you can get it from the English Court.

6  That's not the requirement under US law and Second

7  Circuit precedent. We're asking for VR respondents'

8  documents that indisputably located here in the

9  Southern District of New York and, therefore, are

10 subject to production under 1782.

11         THE COURT:  Mr. Chivers, to get an, just to

12 get an idea of the scope again, do you have a sense of

13 how many documents you would be withholding based on

14 the, like based on the notion that they would just be

15 talking about the knowledge of how to value something

16 abstractly that doesn't relate to the GSPA or the

17 arbitration proceeding?

18         MR. CHIVERS:  I believe it's in the hundreds

19 or thousands, Your Honor, because the email collection

20 includes portfolio, I mean we've given the chief

21 operating officer, former and current, and the emails

22 include documents that are just valuations and

23 analyses of the overall portfolio of the hedge fund.

24         I mean the overall portfolio, just as an

25 example, is something that would be devastating for

1

2  the VR respondents to produce. I mean hedge funds

3  can't be just giving out their portfolio list because

4  Nigeria is interested in the price and the valuation

5  that went into one investment. That's just an example.

6  It is a real example that I have seen and we don't

7  view that as relevant to anything that's going on in

8  the English proceeding.

9         And with respect to the valuation of P&ID, for

10 example, it's not just hypothetical or abstract, the

11 decision whether to invest in an award like this

12 against a sovereign does touch upon the credit markets

13 broadly, the other bonds that the sovereign has

14 issued, the creditworthiness of those bonds, the

15 interest rates on those bonds. I mean it's not just an

16 analysis, it's not a simple analysis and it does

17 provide substantial insight into the institutional

18 knowledge of the hedge fund. And I don't believe it's

19 correct to say that we're withholding anything based

20 on this.

21         If there's a document that's non-privileged

22 and addresses the procurement of the GSPA or the

23 procurement of the award, that gets produced even if

24 it is part of a document that's discussing valuation.

25 And what we've said we don't need to produce is the

1                              PROCEEDINGS                    63

2   purchase price, which is available in the English

3   proceeding, and although there is not an exhaustion

4   requirement, the case law we think makes clear that in

5   a close call like this they should go to the English

6   Court and get that purchase price.

7           And with respect to valuation documents by VR

8   that are unique to the VR respondents, what we've said

9   is we are not going to produce a document that relates

10  generally to valuation, but if it does address the

11  procurement of the GSPA, the procurement of the award,

12  then that gets produced because we've agreed to

13  produce those categories.

14          THE COURT:  And I think Mr. Major had

15  indicated a concern that there had been nothing

16  produced under this category, is that just because

17  you're still reviewing documents and it could be

18  forthcoming or is there really, is it your position

19  that there's no documents that are responsive under

20  that -- when I say these documents I mean the ones

21  that you talk about valuation that relate specifically

22  to the GSPA or the procurement of that award?

23          MR. CHIVERS:  We are still reviewing

24  documents, Your Honor, I don't believe, and I'm

25  reviewing a lot of them given the circumstances which

PROCEEDINGS                        64

I think although Mr. Major has been a little bit
careful about it, there's sort of an undertone of the
VR respondents aren't playing this on the up and up.
That's come through in various statements. We
certainly dispute that but I'm personally reviewing a
lot of these documents and I haven't seen a document
yet that involves a valuation of the P&ID investment
that touches upon the circumstances of procurement of
the GSPA, the circumstances of the award.  There may
be, we are still reviewing, Your Honor, but keep in
mind that when the VR respondents invested in this, it
was an award that would be recognized out of the New
York Convention. It was an investment in the award
that could be enforced, it was not an investment in
something that required looking into the underlying
details. But our review is ongoing and if there are
such documents that relate to procurement of GSPA or
procurement of the award, they will be produced
pursuant to the commitments we've made.

            THE COURT:  And then as I said, I'm going to
take a look at the two cases that both parties have
just pointed me to and I'll take a look at the Second
Circuit decision again and then Judge Engelmayer's
transcript. Do you have, are there any -- when you

```
 1                        PROCEEDINGS                    65
 2  talk about documents generally that pertain to
 3  valuation, that generally pertain to valuation for the
 4  award, is there, are there any sample documents that I
 5  could look at to get a better sense of what exactly
 6  you're talking about when you're saying these are
 7  documents that you don't think you should produce
 8  because they just pertain generally to valuation?
 9          MR. CHIVERS:  I don't know of a specific
10  comprehensive memo that pulls all these things
11  together, Your Honor.
12          THE COURT:  But --
13          MR. CHIVERS:  When I described the valuation
14  it was in terms of documents that, that analyze the
15  financial markets broadly and Nigerian
16  creditworthiness or other Nigerian debt that's been
17  issued, for example, which goes into the valuation.
18  But I'm not aware of a document that is, you know,
19  labeled valuation methodology for the P&ID investment
20  or something like that, that would represent a
21  consolidated valuation.  I haven't seen that document
22  yet, I'm not sure it exists.
23          THE COURT:  No, and I'm sure my question
24  wasn't clear, I just wanted to see examples of the
25  types of documents you're not going to produce because
```

PROCEEDINGS                    66

1

2   based on the arguments you've made today you would say

3   they discuss generally the credit markets or Nigeria's

4   creditworthiness, or something that's not related to

5   the GSPA. I just wanted to see the types of documents

6   that you would be withholding.

7          MR. CHIVERS:  Understood, Your Honor, it's

8   something that I can work on certainly.  I'm not

9   certain exactly what documents Your Honor would like

10  to see, although I think I have a good sense, if

11  that's something that Your Honor would like to be

12  submitted in camera so you understand what I'm

13  referring to. I think we certainly would be amenable

14  to that.

15         THE COURT:  So I'm not trying to make more

16  work for you, Mr. Chivers, so I don't, I don't need

17  like, it's hard to talk about this in the abstract. So

18  if you had one or two documents you wanted to point me

19  to that were representative of what you think are the

20  valuation documents that talk about valuation of the

21  investment generally that would not be responsive to

22  the request, I think it would be helpful to see. But

23  if that's, if that's not really something feasible

24  within the scope of the documents you have, then you

25  should let me know.

```
 1                          PROCEEDINGS                    67

 2              MR. CHIVERS:  I am just not sure, Your Honor,

 3    that there are documents that are specific to the

 4    investment in P&ID, related specifically to P&ID that

 5    aren't just documents that are following the

 6    creditworthiness of Nigeria. I've personally seen

 7    documents following the creditworthiness of Nigeria

 8    and other bonds that Nigeria has. I will say, a lot of

 9    the documents that I'm describing now are also

10    privileged communications with attorneys because, for

11    the most part, the efforts related to enforcement are

12    efforts that are undertaken by attorneys. But I think

13    if Your Honor is referring to at the time of the

14    investment in P&ID and documents related to the

15    valuation thereof, that's something that I can look

16    into after this conference and I can attempt to

17    provide examples of that.

18              To be totally clear, I'm not aware of a

19    comprehensive valuation document and I'm certainly not

20    aware of a document that speaks about valuation in

21    terms of the underlying circumstances as to

22    procurement of GSPA or procurement of the award, and

23    those would be produced pursuant to the commitments

24    we've already made.

25              THE COURT:  Okay, I think I understand. So
```

```
 1                        PROCEEDINGS                    68
 2  let's just, let me read the two cases and I'll reread
 3  the Second Circuit's decision and I'll look at what
 4  happened at the hearing transcript before Judge
 5  Engelmayer. So I don't, like I said, like I know
 6  there's a time crunch here and November 30th is the
 7  deadline, so if I think I need more I'll come back to
 8  you, I'll come back to the parties but so then don't,
 9  don't -- hold off on my request, Mr. Chivers.
10           MR. CHIVERS:  Understood, Your Honor, thank
11  you.
12           THE COURT:  So I think we were moving on to
13  the third category?
14           MR. MAJOR:  Yes, Your Honor, this is Chris
15  Major for Nigeria. The third and final scope issue we
16  raised in our letter are documents related to lobbying
17  and public relations work that was undertaken by P&ID,
18  specifically through the VR respondents' former
19  counsel, Kobre & Kim, and also two public relations
20  firms. And those, the lobbying efforts, as we've been
21  able to determine from publicly available information,
22  were, in our view designed to try to influence various
23  constituencies regarding Nigeria and the attempts to
24  enforce this award.
25           For example, there has been a long running
```

PROCEEDINGS                    69

website called P&ID facts pursuant to which the folks

trying to enforce the award have been putting out

information which, you know, our client would

certainly dispute, and also following the various

litigations and things like that.  There have also

been letters written to English politicians and US

politicians and the Department of Justice, in our

view, in an attempt to facilitate and as an ancillary

campaign in furtherance of the award.

      We have asked for these documents which

include communications with non-lawyer lobbyists and

public relations professionals and we, in a

categorical privilege log which just generally

described the group of documents. The VR respondents

have taken the position that these documents are

somehow privileged and we've cited a couple of cases

in our letter which I think demonstrate the

(indiscernible) positive of the privilege claim

because obviously communications with the non-lawyers

are outside of any potential litigation and outside of

any attorney-client communications or work product.

And I think on the strength of the two cases that we

cited, and the facts which are not disputed, the

privilege log makes clear, and in our discussions with

PROCEEDINGS                    70

1

2  the VR respondents dating back to the summertime, you

3  know, no one has disputed that there communications

4  with the public relations firms and lobbyists that are

5  not, that are obviously non-legal communications. And

6  for that reason we think those documents should be

7  produced.

8            THE COURT:  Mr. Chivers?

9            MR. CHIVERS:  Yes, Your Honor.  First, a

10 clarifying point about the documents that Mr. Major

11 described as having been put on a privilege log.

12 Those documents were put on a privilege log in the

13 Schofield proceedings, I don't think it's procedurally

14 proper for Nigeria to assert, to challenge a privilege

15 claim that was made in the Schofield proceeding in

16 this proceeding. There has been, although I think

17 there will be, in the interest of candor I think there

18 will be documents put on a privilege long from this,

19 from the production that we're underway, but there is

20 no, there is no document that's on a privilege log in

21 this case. That's, those documents he's referring to

22 are in the Schofield matter, I don't think it's

23 procedurally proper to point to those documents

24 produced in the other case and then assert that they

25 should be, you know, this Court should rule on them

```
 1                          PROCEEDINGS                    71
 2   now.
 3          With respect to -- but before getting to the
 4   privilege issue which I do want to respond to, having
 5   looked at this issue many times I do not see how
 6   Nigeria connects the dots between the VR respondents
 7   working with either lobbyists or public relations
 8   people in 2019 and later being relevant to whether a
 9   contract in Nigeria was procured by fraud in 2010 or
10   the award was procured by fraud in 2017. It is a non
11   sequitur, there is absolutely no relevance to those
12   communications.
13          With respect to the privilege argument, there
14   are two decisions by this Court that are on point with
15   respect to the public relations personnel and the
16   lobbyists, those are In Re: Grand Jury Subpoenas dated
17   March 24, 2003, which is cited at footnote 4 in the
18   respondents' letter at ECF 55, and the second case
19   which is not cited in the letter is In Re:  Copper
20   Market Antitrust Litigation, which is 200 F.R.D. 213
21   at 219. That's a 2001 decision by this Court.  And
22   those two decisions are the squarely applicable
23   authorities with respect to the working with lobbyists
24   and public relations personnel in the context of
25   overarching litigation.
```

```
 1                        PROCEEDINGS                72
```

 2           Now when these lobbyists send PR personnel or

 3   engaged, there was already litigation going on. And

 4   the coordination among the members of a litigation

 5   team are classically privileged material.  Now the

 6   statements that a PR professional made on behalf of a

 7   client to some public source, that's not privileged

 8   when they make that communication, or the statements

 9   made by a lobbyist to somebody else, that's not

10   privileged, but the internal communications of the

11   team that's working on litigation, even if they are

12   lobbyists or public relations folks is within

13   privilege as the two cases that I just cited held. And

14   we think those are directly on point.

15           The decisions cited by Nigeria on page 2, one

16   is *Igiziaran* (phonetic), that's 290 F.R.D. 421, that's

17   a case where the Court was specifically construing New

18   York law, whereas here English and US federal law

19   govern.  There were no looming criminal proceedings in

20   that case, here there were.  And the client in that

21   case in *Igiziaran,* was not a company and that was the

22   ground on which the Court distinguished *In Re: Copper*

23   *Market Antitrust Litigation.* Here, the clients were

24   companies and the *In Re: Copper Market Antitrust*

25   *Litigation* directly applies.

```
 1                         PROCEEDINGS                    73
 2            With respect to the In Re: Chevron Corp. case,
 3    which is also cited by Nigeria, that's a case looking
 4    at a lawyer who was not working in a legal capacity,
 5    he was doing things unrelated to the litigation and
 6    that is distinguishable on that ground as well. So if
 7    the Court were to reach the privilege --
 8            THE COURT:  I was going to say, I don't mean
 9    to cut you off, Mr. Chivers, but I'm, on this one I
10    just don't, I don't understand the relevance so I'm
11    not, I'm not going to reach the privilege issue
12    because I don't think there's been a threshold showing
13    as to why these documents would be relevant to showing
14    that the contract or the award was procured by fraud
15    several years earlier.
16            MR. CHIVERS:  For the VR respondents certainly
17    that is the right decision, Your Honor, we just don't
18    see how they can connect the dots.
19            THE COURT:  Should we, should we move on to
20    the custodians?
21            MR. MAJOR:  Your Honor, this is Chris Major
22    for Nigeria. On the custodians, we have asked for two
23    additional custodians for whom searches have already
24    by conducted by the VR respondents at our request.
25    And they are Mr. du Toit who is the chief financial
```

1                                  PROCEEDINGS                              74

2  officer of VR respondents, and he also is the director

3  of the PHL entity which is the investment vehicle for

4  the award set up by the VR respondents.  And then the

5  second additional custodian is Richard Deitz, he's the

6  founder of VR Capital, and Mr. Deitz has direct

7  involvement in the procurement or purchase of the

8  award and the investment and in all likelihood the

9  attempts to enforce the award which are, is part of

10  the fraud. The enforcement of the award is a

11  continuing part of the fraud and the whole goal of the

12  fraud is to ultimately turn the fraudulently obtained

13  award into cash and that's -- or other assets.

14          So that's, you know, the ongoing enforcement

15  in part and parcel of the fraud, and the English Court

16  in its judgments back in September of 2020 that

17  permitted Nigeria to go forward with the English set

18  aside trial that is upon us, you know, specifically,

19  you know, referred to that, the ongoing nature of the

20  fraud including attempts by P&ID's prior counsel,

21  which was Kobre & Kim, just like that also represented

22  the VR respondents, their attempts to block our

23  original Section 1782 proceeding against the banks.

24  The English Court cited that as furtherance of the

25  fraud in terms of trying to impeded Nigeria's ability

1                          PROCEEDINGS                    75

2  to collect information.

3            So just to give you, the Court, a few facts to

4  show the relevance and the fact that Mr. Deitz and Mr.

5  du Toit do, in fact, have highly relevant documents,

6  and I think that this, these facts may, among other

7  facts, make the cases that the VR respondents cite in

8  their letter obviously distinguishable. You know, they

9  cite to cases where executives of very large

10 corporations and multinational corporations, you know,

11 can't be forced to, for example, sit for a deposition

12 or have their records searched if it's, if there is no

13 basis to believe that they are, you know, directly

14 involved in whatever the situation is, you know,

15 whether it be a transaction or whatever.  Whereas,

16 here, first of all, the VR Capital is not a gigantic

17 corporation, it's a relatively small operation, it is

18 part of, it's an investment company, it's a hedge

19 fund, as Mr. Chivers has described it, it doesn't have

20 thousands of employees and all different kinds of

21 operations.

22           Mr. Deitz, and from what I can tell on the

23 internet, I didn't take this from VR's website, but it

24 appears that VR has roughly $4 or $5 billion under

25 management. This, you know, purchasing 25 percent of a

1

2    $10 billion award is a very big deal for the VR

3    respondents, so it's unsurprising that Mr. Deitz has

4    been heavily involved and the hit counts bear that

5    out.

6            So, for example, and the other thing the VR

7    respondents do is they point to, you know, Mr. Nemser

8    as having a lot of relevant documents, and he does,

9    but so does Mr. Deitz.  The hit count for Mr. Deitz

10   for the term P&ID, he has over 10,000 hits.  For

11   process and industrial spelled out, he has over 11,000

12   hits.  For GSPA, he has 2,800 hits, and I'll give you

13   one further example which is Taiga, T-A-I-G-A, that's

14   referring to Grace Taiga and/or her relatives who were

15   recipients of bribes. Grace Taiga was in the Ministry

16   of Petroleum and signed off on the GSPA and has

17   received numerous bribes. Mr. Deitz has 1,499 hits

18   with her last name, there is no other explanation for

19   why he would have any documents with her last name

20   except for the fact that he has been heavily involved

21   in the process of acquiring the award and attempting

22   to enforce the award. And for that reason I think it's

23   obvious that he should be added as a custodian.

24           Mr. du Toit has less documents but still as

25   CFO, as you would expect for such an important

PROCEEDINGS                    77

transaction through his hedge fund, he also has

thousands of documents. For process and industrial

spelled out, he has 8,549 hits.  For P&ID, the

acronym, he has 1,656 hits.  And so I think, again, it

shows that these are not two high level executives who

know nothing about some relatively small matter, they

are high level executives who have been directly and

heavily involved in the acquisition of the award and

the attempts to enforce it. And for those reasons I

think they obviously should be added as custodians and

shouldn't have been excluded in the first place.

          THE COURT:  Mr. Major, when you talk about the

hit count, so, for instance, with -- with Mr. Deitz,

where they also that, where the VR respondents say

that they have produced the documents or the custodian

is Joshua Nemser, when you talk about hits pertaining

to Mr. Deitz, these are hits that don't, like so for

emails I wouldn't also hit upon -- so they're unique

hits, they're not ones where Mr. Nesmer was also a

custodian of the email because he was cc'd or copied

or somehow involved in the chain?

          MR. MAJOR:  I would doubt that they're all

unique hits, there probably are unique hits but I

would assume that once the VR respondents ran their

PROCEEDINGS                    78

deduplication process, that what they would actually

have to review would be lower than the numbers I just

shared with the Court.  The reason for my sharing

those numbers with the Court was to counter the

argument that counsel for VR respondents made in their

letter that these two gentlemen, you know, are not

likely to have relevant information when, in fact, the

hit counts bear out that they do. But, again, I would

assume that, for example, Mr. du Toit and Mr. Deitz,

as CFO and as the founder and CEO, respectively, that

they are probably on some of the same emails so they

should get, through the deduplication process those

numbers would come down in terms of what needs to get

reviewed and produced. But the problem is we know, for

example, Mr. Deitz is on a document which was the

original email pursuant to which the VR respondents

started to consider making the investment and he was

the only person on that email from the VR respondents.

So that's just an example of what we will miss if, in

fact, Mr. Deitz is not a custodian on the list of the

collection and production of documents.

        The only reason we have that document is from

a prior discovery dispute with prior counsel we were

discussing how to figure out limiting the date range

1                          PROCEEDINGS                    79

2   to lessen the burden for the VR respondents to

3   collect, review and produce documents and they

4   represented to us and provided us a copy of that email

5   just to demonstrate to us that that email was the

6   first involvement by the VR respondents in August of

7   2017.  But, again, so that's the only document we have

8   from Mr. Deitz' email account, but there are, you

9   know, presumably and undoubtedly additional emails

10  where they're not going to be duplicated because, you

11  know, we have, the only document we ever got from his

12  inbox, you know, was a communication where he is the

13  only one on it. But, again, the deduplication process

14  will take care of the emails that are already in the

15  email accounts of the agreed upon custodians but

16  obviously we'd like to make sure that we get all of

17  the relevant documents.  And to do that we have to

18  have as custodians these two additional individual who

19  were heavily involved in the transaction and the

20  attempts to enforce the award.

21          THE COURT:  Okay, Mr. Chivers?

22          MR. CHIVERS:  Thank you, Your Honor. I want to

23  start by pointing to the, I think the initial premise

24  of Nigeria getting documents from Mr. du Toit and Mr.

25  Deitz which is that the enforcement of the award is

part of the fraud.  The assertion that the enforcement

of the award is part of the fraud sounds to me like an

accusation against the VR respondents. I think it is

unmistakable, and that is an entirely inappropriate

basis to seek discovery in this case.  If that is the

theory now based on nothing that the VR respondents

are part of the fraud because they sought to enforce

an award that was rendered by three distinguished

jurists in London, and that is part of the fraud, and

that's going to be the basis for getting additional

discovery, I think that there's no support for that.

        The enforcement of the award is also not part

of the English proceeding which is the anchor of any

proportionality or relevance analysis here, and

Nigeria laid out in ECF 4 in its declaration the

English proceedings, and those seek to set aside the

award based on the procurement of the GSPA and the

procurement of the award. The enforcement is totally

outside the scope of that. So to use the enforcement

of the award as a basis for expanding discovery has no

basis in the application that was granted.

        With respect to the, the allegation by Nigeria

that Mr. du Toit and Mr. Deitz were directly and

heavily involved, there is no evidence of that.  The

only thing that they point to is a search term hit

report, and I'll mention -- and I'll get to that in a

moment. But Nigeria has gotten broad discovery from

numerous witnesses in numerous forums and they have

not pointed to any fact or document suggesting that

Emile du Toit or Richard Deitz would have knowledge or

evidence related to the underlying GSPA or the

arbitration proceedings that led to the award.  They

have put in nothing to support that assertion.

        And the cases that we cite in footnote 7 of

our letter say pretty clearly that the party seeking

discovery cannot get to the top executives' email

accounts with so little of a showing. I mean here

there is no showing.

        With respect to Mr. Deitz being on the

original email, that's unsurprising, he is the head of

the fund and he got an inbound inquiry related to the

award being, or related to the award, related to P&ID

and I think Nigeria has already acknowledged that it

has that document.

        With respect to the search term hits, the

search term report that Nigeria is referring to was

run on a time period that expand from 2017 until

October, 2021, more than four years.  And during those

1

2   four years there have been enforcement proceedings,

3   there has been Nigeria's action to set aside the

4   award, there have even been Section 1782 proceedings,

5   and every one of those documents makes reference to

6   P&ID and GSPA and a lot of them make reference to

7   Grace Taiga, too.  And it is totally unsurprising that

8   this number of documents would show up because Nigeria

9   is creating them and the VR respondents are creating

10  them in the course of litigating in multiple forums.

11  So Nigeria is pointing to, I mean it has caused an

12  expansion in the number of documents that have these

13  search terms through the various litigations, and then

14  it's pointing to those search terms as a reason to

15  expand discovery, and it has no other basis to do so.

16          With respect to burden, the burden would be

17  very substantial to review the CFO's and the

18  president's emails. The search terms that Nigeria has

19  demanded and that we've agreed to are extremely

20  overbroad. The term Quinn, for example, hits on every

21  email that has Quinn Emanuel in it. Quinn Emanuel has

22  represented the VR respondents in other litigation and

23  represents them in the English proceeding here. And

24  we're going through thousands of emails related to

25  Quinn Emanuel doing things that have nothing to do

1                          PROCEEDINGS                    83

2   with this overall litigation. And the other search

3   terms similarly are overbroad and go well beyond the

4   procurement of the GSPA and the procurement of the

5   award.

6          And with respect to burden of reviewing the

7   CFO and CEO, I would have to do a different kind of

8   review for those emails. I mean this is, we're talking

9   now about the CFO and president of a global hedge fund

10  and overbroad search terms that are going to pull in

11  things like their entire investment of, you know,

12  their entire portfolio, communications about their

13  entire portfolio, communications related to decisions

14  that they're making unrelated to this and unrelated to

15  the procurement of the GSPA and the procurement of the

16  award. And I can't just send that to an outsource shop

17  to have people that we don't know and that the VR

18  respondents don't know just reviewing the sensitive,

19  commercially sensitive emails of a global hedge fund,

20  the burden would be enormous. And the burden is not

21  balanced out by a likelihood of probative material,

22  they just, they haven't come close we think to making

23  the showing that the case law requires to expand the

24  search and we have given the, you know, we've given

25  the portfolio manager who conducted the due diligence

1                          PROCEEDINGS                    84

2  and has worked most closely on the investment, we've

3  given them the former general counsel who was the

4  general counsel at the time the investment was made,

5  and the former and the current chief operating officer

6  of the company.

7          We think that we've given enormous concessions

8  with respect to custodians and that they haven't come

9  close to making the showing to get at the top

10 executives. It would also be a terrible precedent,

11 frankly, Your Honor, if any time there's a dispute

12 related to a portfolio investment, that anybody who

13 wants documents from the head of a hedge fund or the

14 CFO of a hedge fund, just needs to point to, you know,

15 the fact that, they need to point to almost nothing

16 and they get access to those extremely sensitive

17 emails. We don't think it makes sense and we don't

18 think it's supported by the case law.

19         THE COURT:  Mr. Major, specifically talking

20 about Mr. Deitz right now, other than the August,

21 2017, email, is there anything you can point to that

22 would show he was in, he was heavily involved in

23 acquiring the 25 percent award --

24         MR. MAJOR:  Yes, Your Honor.

25         THE COURT:  And I heard about, I heard the

```
 1                        PROCEEDINGS                    85
 2   search term hits, but other than the search term hits
 3   and the August, 2017, communication.
 4            MR. MAJOR:  Yes, Your Honor, there are emails
 5   that have been produced, including a whistleblower
 6   came forward for the VR respondents to disclose the
 7   fraud to the VR respondents.  Mr. Deitz is on that
 8   email chain. It's been produced from another
 9   custodian, not from Mr. Deitz' files obviously because
10   that's been refused. But, yes, so we have seen him on
11   other emails.
12            But, Your Honor, I don't think the hit count
13   should be dismissed. That hit count, by the way, Your
14   Honor, was determined back when we had over 100 search
15   terms under consideration. In terms of the burden, we
16   have since agreed with counsel for the VR respondents
17   to just 29 search terms and we have not been provided
18   with a fresh hit count based on that production.
19            With respect to the term Quinn, I'm sorry that
20   it's increased the amount of documents that have to be
21   reviewed per what counsel has just said, but they
22   agreed to the term Quinn. In any event, I don't think
23   it's proper to start raising burden issues at this
24   stage when what we were told in our meet and confer is
25   you're not getting anything from Mr. Deitz and Mr. du
```

```
 1                          PROCEEDINGS                    86
 2  Toit, they didn't say, hey, he has a lot of Quinn
 3  Emanuel emails, can we talk about that, they said
 4  you're not getting them.  And this idea that the cases
 5  that deal with executives who are not involved in the
 6  disputed transaction or in the product liability issue
 7  or what have you, those cases have no applicability.
 8              I know that counsel keeps referring to it as a
 9  global hedge fund, but it doesn't have a lot of
10  employees. These organizations are nimble. And Mr.
11  Deitz, the fact that he has so many documents using
12  these very particular terms that go to this
13  transaction, demonstrates that he is heavily involved.
14  And some of the arguments that the VR respondents are
15  making don't make any sense frankly, because you can't
16  say that he wasn't involved and then say, you know,
17  that the reason he has so many hits was because of the
18  litigation.  Well that means he's getting copied on
19  everything and he wouldn't be getting copied on
20  everything if he was some disconnected president who
21  only deals with big picture issues and doesn't get
22  involved in particular investments. I don't think that
23  represents how hedge funds operate, especially smaller
24  ones like this and, again, this is an investment in
25  one quarter of a $10 billion award and a hedge fund
```

PROCEEDINGS                    87

1

2  that, as far as I can tell, has between $4 and $5

3  billion under management, this is an incredibly

4  important investment for this hedge fund and that's

5  why its president and founder is involved. And the

6  fact that he's involved is enough for us to get his

7  documents. And the same goes for the CFO.

8          This isn't a case where, you know, somebody is

9  injured in a car accident and wants to take GM's CEO's

10 deposition, you know, this is a case, Mr. Deitz was,

11 in fact, involved, and I don't think it's reasonable

12 for the VR respondents to say you haven't come forward

13 with emails, with Mr. Deitz' emails, well because you

14 won't give them to us.  And we're not expanding the

15 search, Mr. Deitz and Mr. du Toit have been identified

16 as custodians we want from the beginning of the meet

17 and confer process, we were just told no and that's

18 why we, you know, at the conclusion of the meet and

19 confer we brought it to Your Honor's attention for a

20 decision. But I do think that those hit counts

21 demonstrate that he's got the documents and our

22 understanding is that Mr. Deitz was, you know,

23 involved in the, in the investment and those search

24 terms show that he was heavily involved.

25          THE COURT:  Can I, just a follow-up, if you're

1

2  getting Mr. Deitz' emails from other custodians, why,

3  I mean it seems that he, so the VR respondents claim

4  there's a burden to reviewing Mr. Deitz' documents,

5  and it sounds like at least some of them are coming

6  from other custodians, so I guess at this stage why

7  impose the burden on them to have to look for or to

8  search his files or his emails?

9           MR. MAJOR:  Well I think that it's, in terms

10 of why to impose the burden on them, the question is

11 really whether it's an undue burden. And I don't think

12 it's an undue burden to have to search what I believe

13 to be, you know, a total six or seven, I don't have

14 the number in front of me, total custodians for,

15 again, it's all about proportionality. This is a more

16 than $10 billion fraud and, you know, is there going

17 to be some work involved, yes, but I think the

18 argument about burden, which hasn't been raised to us

19 with respect to this issue before, it was a matter of

20 principle that they were not going to give us

21 documents from these two gentlemen.  But in any event,

22 they haven't run the hit count with the reduced search

23 terms to see what the volume may be and they haven't

24 come to us with any complaint about the burden or, you

25 know, a particular issue that may help resolve it.

```
 1                           PROCEEDINGS                  89

 2           I think at the end of the day if they want to

 3  make a burden argument they, at a bare minimum, should

 4  have to run the search terms, run a deduplication and

 5  then we can see what the number is.  But what if Mr.

 6  Deitz has a lot of documents where he's not copying

 7  the agreed upon custodians? In that case we don't

 8  have, we're going to be missing the relevant documents

 9  merely because they decided not to search somebody who

10  was, who was clearly involved. I don't think that the

11  VR respondents could possibly maintain that he wasn't

12  involved given the level of hit count activity we see,

13  given the size of this investment relevant to the

14  overall size of the hedge fund, and given the fact

15  that he is on emails that we've seen, and obviously

16  from the hit counts he's on a lot of them.

17           THE COURT:  Okay, so, Mr. Chivers, with

18  regards to Mr. Deitz, can you, before I give you a

19  decision on what to do with Mr. Deitz, I'd like to see

20  what the hit count is with the reduce agreed upon

21  search terms, and after you run some deduplication to

22  ensure that these are just original hits.

23           MR. CHIVERS:  May respond first, Your Honor?

24           THE COURT:  Sure, go ahead.

25           MR. CHIVERS:  Because there's several, there's
```

1                           PROCEEDINGS                       90

2   several misconceptions embedded in what Mr. Major is

3   saying.  First of all, we definitely raised the burden

4   issue. Mr. Major may not have been on the call, but if

5   Mr. Kim is still on this call I think he can confirm

6   that I made exactly the same argument to him about the

7   burden of reviewing Mr. Deitz' and Mr. du Toit's

8   emails.  We definitely raised burden.

9           With respect to whether we should be, you

10  know, with respect to whether Mr. Deitz was directly

11  and heavily involved, there is no evidence of that.

12  And the only thing that Mr. Major points to is that

13  Mr. Deitz has emails with certain search terms but

14  directly and heavily involved in what? Directly and

15  heavily involved in whether there was fraud in the

16  procurement of the GSPA, whether there was fraud in

17  the procurement of the award, or involved in the

18  management of an overall portfolio that includes this

19  investment? And that's the issue, they're just

20  pointing to these search terms and saying, well,

21  these, there are emails that hit on these search

22  terms, therefore, Mr. Deitz must have been involved

23  and must have unique relevant documents related to the

24  procurement of the GSPA and the procurement of the

25  award, and that is a leap that is based on nothing.

```
 1                         PROCEEDINGS                    91
 2            With respect to the document that Nigeria
 3    points to, I think that the fact that they've
 4    submitted the email really underscores that,
 5    notwithstanding all the discovery they've received,
 6    they can't point to any actual reason to believe that
 7    Mr. du Toit or Mr. Deitz would have unique relevant
 8    documents related to the underlying GSPA and the
 9    underlying award. That's an email from somebody who
10    specifically says they're going to go to Nigerian law
11    enforcement and we are producing emails form Mr.
12    Nemser, the other custodian. To the extent that Mr.
13    Deitz is on them or Mr. du Toit is on them, those will
14    get produced, too.
15            We're just, we're not seeing it, there's
16    plenty of case law with respect to what kind of
17    showing needs to be made to get into the top
18    executives' email account and we seem to just be
19    skipping past that. And I have no doubt that there
20    will be unique documents that hit on these terms
21    because we're talking about the CFO and the hedge fund
22    manager and they're talking about the investment at a
23    different level. You know, they talk about the
24    investment at the level of portfolio balancing, and
25    portfolio management and what's in the portfolio.
```

1

2  Those documents have nothing to do with whether the

3  GSPA was procured by fraud or procured, or the award

4  was procured by fraud.

5          So what we're going to see if we produce a

6  unique hit report is there's a whole lot of documents

7  but are they relevant, there's no reason to believe

8  they are. And Nigeria has still, I mean they've been

9  doing discovery on these issues for three or four

10  years, they have witnesses in Nigeria, they have

11  emails from us, they're getting emails and other

12  documents in the English proceeding, and they have

13  given no reason to believe, they don't point to a

14  single witness statement, a fact, a document that

15  would suggest that Mr. du Toit or Mr. Deitz know about

16  what happened in Nigeria in 2010, or what happened in

17  the London proceeding leading into 2017 when the

18  involvement by the VR respondents was all after that

19  fact and they're operating at the level of the entire

20  fund.

21          MR. MAJOR:  Your Honor, this is Chris Major

22  for the applicant. What Mr. Chivers is doing is he's

23  trying to reargue your order which gave us discovery.

24  He's saying that he's not drawing any distinction

25  between Mr. Deitz and Mr. du Toit or the other

1                              PROCEEDINGS                        93

2   custodians. The Court has already ordered that

3   discovery take place and the reason we've been at this

4   for years is because we had to take an appeal based on

5   the VR respondents' obstruction, and we took that

6   appeal and came back down in this proceeding. We filed

7   it, it was referred to a recently retired magistrate

8   judge. We wrote to the Court periodically asking for a

9   ruling on the application, and we just got that ruling

10  from Your Honor after you took over the case a couple

11  of months ago and we were directed to meet and confer.

12          The document production that we've been, that

13  we've received so far from the VR respondents is

14  paltry, I mean we have 500 or so documents so far. So

15  the idea that we should be required to give, you know,

16  put forth documents that would show that Mr. Deitz was

17  involved when they steadfastly refused to give us his

18  documents, and when they have not yet even gotten to

19  the individuals' emails yet, we haven't received those

20  yet.  And we've just gotten them from the share drive

21  so far from the production that's ongoing right now,

22          And so I think it's, I understand counsel

23  wants to try to set up some kind of impossible burden

24  so they can shield Mr. Deitz' documents, but at the

25  end of the day, those search terms are inescapable, he

PROCEEDINGS                    94

1

2   has documents and it's not portfolio balancing and

3   macro issues, he has Grace Taiga in 16,000 documents -

4   - excuse me, that's P&ID, in thousands of documents

5   that are in his possession. And counsel just conceded

6   that there are likely to be unique hits.  That means

7   if these custodians aren't included we're going to be

8   deprived of documents that have these highly relevant,

9   heavily negotiated search terms turning up in them.

10         So I don't think it's too much as to ask

11  before you can, you know, prevail on a burden

12  argument, to actually have to explain what that burden

13  is, what are the numbers, after they've reduced the

14  search terms and after they've run a dedupe, how many

15  unique documents are we talking about. I bet it's not

16  that much of a burden, but at a minimum we should know

17  what those numbers are before they can escape having

18  to review Mr. Deitz' emails.  But it's -- I'm sorry.

19         THE COURT:  No, no, just because we're running

20  over and I recognize that's I'm sure my fault. So with

21  this, I'm just talking about Mr. Deitz, so you've

22  convinced me, I think given the fact that the 25

23  percent award was a significant investment, given what

24  you had indicated was the overall value of money being

25  managed by the hedge fund, you know, I see the

PROCEEDINGS                               95

argument of why Mr. Deitz could potentially have

relevant documents because he might have been

involved, he might have been more than just a high

level executive here because it would have been a

significant investment for the fund.

I'd like to see, as I said, just to run the

search terms with the -- to run the, to see the hit

report with the new reduced search terms and after

deduplication. Because I think if this really is a

case where he was just a high level executive, then

presumably we shouldn't be seeing a lot of documents

at all once you've run the new search with the

different search terms and after you've deduped the

documents.

So, Mr. Chivers, if, I think to make the

burden argument I'd like to see the hit count with the

new search terms first.

MR. CHIVERS:  Your Honor, they have pointed to

nothing, you know.  With respect to burden, we don't

even get there unless they can point to some reason to

believe he has documents related to the procurement of

the GSPA and the procurement of the award. If we have

-- yes, there will be unique documents hitting on

their search terms, but that doesn't mean they're

PROCEEDINGS                          96

documents related to the procurement of the GSPA or

procurement of the award. I just, they haven't made

any showing. I they can't point to a single case that

supports this kind of discovery into the head of a

hedge fund. So it's also a really bad precedent.  Mr.

Deitz and Mr. du Toit are both based in England within

the jurisdiction of the English Court and Nigeria is

coming to the US Court with no evidence of their

involvement in the underlying circumstances and saying

that they get into their emails. There's no precedent

for this, they don't point to any in there -- they

don't point to any in their papers and we think it

runs directly against what this Court has previously

held.

          MR. MAJOR:  The documents are located in this

district, the VR respondents can't and will not

dispute that, that's the test is where the documents

are located. It doesn't matter where these two

gentlemen are located at any given point in time, but

the documents are located here. And we have cited

plenty of (indiscernible) including in our papers to

obtain the Section 1782 award. All we have to

demonstrate is that the documents are for use in a

foreign proceeding and that they're located in this

```
 1                        PROCEEDINGS                    97
 2  district. And we've already established that.
 3         Obviously, the VR respondents are, you know,
 4  don't want to have to produce Mr. Deitz' records but,
 5  you know, to continue to say that there is some test,
 6  or threshold, or hill you have to climb before you can
 7  get the head of a hedge fund's documents is a
 8  ridiculous argument. He is involved in the
 9  transaction, the hit counts show that, and he's not
10  treated any differently, if he is likely to have
11  relevant documents, his email account should be
12  searched. It's a small universe of custodians and the
13  hit count report, you know, reveals it all.
14         I think that, you know, there's no reason for
15  counsel to continue to try to argue this. I understand
16  his client may be upset with this, but this is, you
17  know, obvious discovery that we have been seeking for
18  a long time and the hit counts are inescapable. I
19  think we should just proceed with the, seeing what
20  this burden is. They shouldn't be able to use the
21  burden as a shield and a sword when they're not even
22  willing to, you know, tell the Court and us what the
23  actual numbers are.
24         THE COURT:  Okay, so I think I've already
25  indicated with regards to Mr. Deitz how we should
```

1

2    proceed. I still, though, I was treating du Toit

3    differently, and for him I just wanted, Mr. Major, if

4    you could just explain again what your argument is for

5    why Mr. du Toit, and I'm sure I'm mispronouncing his

6    last name, but for why his documents are relevant.

7           MR. MAJOR:  Yes, Your Honor. So I should, just

8    for the record, I'll spell his last name, it's, the

9    first name is Emile, E-M-I-L-E, lower case D-U, for

10   du, and Toit is T-O-I-T, and Toit the T is capitalized

11   there, just for the record.

12          So he played two I think important roles in

13   connection with the transaction and the award and so

14   forth.  Number one is he's the CFO and, again, I read

15   earlier, I won't belabor the point, that the hit

16   counts show that he's certainly, you know, emailing

17   and receiving and sending emails about this in the

18   thousands. And, again, given the importance of this

19   award, of this investment relative to the fund, you

20   would expect the CFO, it's not surprising here that

21   the CFO and the CEO are spending time on this, on this

22   matter.

23          The other role that he played is at the

24   director of PHL, Process Holdings Limited, which is

25   the claimant in the arbitration over in England

1                        PROCEEDINGS                    99

2  against the partner and is also the entity through

3  which the investment was made.  And, you know, again,

4  it's not surprising but it is confirmed by the hit

5  count report that he has lots of relevant documents in

6  his possession.

7           And so, again, and the fact that he is

8  overseas, whether he's always overseas or sometimes

9  overseas doesn't matter, the issue is that the

10 documents are found here. I'll have a hard time

11 pronouncing this case, but the case is *In Re:*

12 (indiscernible), 2006 WL 384464 at page 5 (S.D.N.Y.

13 Dec. 29, 2006), which states that for Section 1782

14 discovery the issue isn't where the custodian is found

15 but rather where the documents are found.

16          So I think the same arguments apply to Mr. du

17 Toit and I think that the same search exercise should

18 be undertaken before any burden argument could be used

19 to deprive us of that scope.

20          THE COURT:  Mr. Chivers?

21          MR. CHIVERS:  Thank you, Your Honor. I really

22 think Mr. Major's further argument just underscores

23 how far afield we are from relevance.  Mr. Major is

24 equating a search term hit with relevance. He's done

25 it several times in the argument and that is way

beyond what the search terms show.  The English

proceeding is based on whether the GSPA was procured

by fraud in 2010 in Nigeria and whether the

arbitration proceedings in London leading into 2017

were tainted by fraud.

        Mr. Major points to search terms and says they

must be heavily involved, they must have relevant

documents, but there's no indication that that is true

with respect to the underlying frauds that are

relevant to the English proceeding. They may have

documents related to the investment, itself, but how

does that relate at all to the English proceeding? And

Nigeria has yet to describe that and we really are

very far afield from what's relevant to the English

proceeding, itself.

        THE COURT:  Can I just ask you a question

there, because you said they may have documents

relating to the investment, itself, isn't it similar

to the valuation issue and Nigeria's argument being

that at the time they made the investment, you know,

depending on what might have been said, you might be

able to show it as a fact demonstrating knowledge of

the fraud?

        MR. CHIVERS:  Well that might be from, I mean

that argument applies to before the investment was

made perhaps, although we continue to maintain that

unless the document related to the investment

addresses the underlying GSPA or the underlying award,

it still is not relevant. But Nigeria is asking us to

collect documents from years of litigation and from

years after the VR respondents made the investment and

the investment is just on their books. And there's

various ways that the CFO and the manager could

discuss an investment that has nothing to do with

whether the GSPA was procured by fraud or the award

was procured by fraud.

THE COURT:  But isn't that a separate issue of

your date range problem?  Like couldn't potentially

your concern be remedied if I were to allow search of

these two custodians, can the concern be limited by

the date range?

MR. CHIVERS:  It would certainly help, Your

Honor, it would certainly help. We still do not see

how they're connecting the CFO and the president of

the fund to the underlying GSPA and the underlying

award, I don't think there's anything there. I mean

it's not that there's only a little bit there, I think

that there's nothing there and they've gotten

```
 1                        PROCEEDINGS              102
 2  discovery form numerous forums. The time period would
 3  help, of course, Your Honor.
 4         THE COURT:  The new, the reduced search terms
 5  that the parties had agreed upon that were going to be
 6  used for Mr. Deitz, I assume you don't know what the
 7  new hit count would be for Mr. du Toit with those
 8  search terms?
 9         MR. CHIVERS:  Correct, Your Honor.
10         THE COURT:  And the search terms that you're
11  running, what is the date range being used?
12         MR. CHIVERS:  The searches that we've agreed
13  to do and the collection we've already done, the
14  review that's underway, goes from I believe January 1,
15  2017, until December 5, 2019.
16         THE COURT:  And the investment, the initial
17  investment was made when?
18         MR. CHIVERS:  I believe the initial email that
19  Mr. Major referred to was August, 2017, or late August
20  or early September, 2017. And I believe the
21  transaction, itself, occurred in late 2017 or early
22  2018.
23         THE COURT:  And the enforcement proceeding for
24  the arbitration award, that was 2019?
25         MR. CHIVERS:  I believe some of the
```

1

2  enforcement proceedings began in 2018, I'd have to

3  double check the timeline on that.

4          THE COURT:  So I think, I'm going to treat Mr.

5  Deitz and du Toit similarly. So we can, once you are

6  able to run a new hit count, get a new hit count with

7  the reduced search terms, after it's been deduped to

8  see how many unique hits there are, I'm assuming

9  you're making a burden argument for Mr. du Toit, as

10 well?

11         MR. CHIVERS:  I think primarily we're making

12 the argument under footnote 7 in the cases there which

13 do set forward a standard, although Mr. Major said

14 there's no standard, I think those cases clearly do.

15 That's the argument that we're making, it's a

16 combination of relevance and burden.  None of the, I'm

17 not aware of anybody in those cases doing a unique

18 search term report, I think that the Court just denied

19 it because there was no threshold showing that there

20 would be a reason to believe they have relevant

21 documents.

22         If we reach burden then, yes, with respect to

23 du Toit and Deitz we would argue burden, as well.

24         THE COURT:  Okay.  So I think for the reasons

25 I indicated for Mr. Deitz, I do think Nigeria has made

1

2   that threshold relevancy argument so I'd like to see

3   the hit counts. And while you're getting those I'll

4   take a look at the cases at footnote 7 again but what

5   I said before for Mr. Deitz would apply to Mr. du

6   Toit.

7            Do we want to move on to the date range?

8            MR. MAJOR:  Yes, Your Honor, thank you, this

9   is Chris Major for the applicant. In terms of the date

10  range, what we've produced is January 9, 2021, that's

11  the date that we filed this application for Section

12  1782 discovery. And I think it's probably apparent but

13  the reason that we picked that date is, as we do in a

14  lot of US litigations, is you agree that after a

15  certain proceeding is filed you don't have to, you

16  know, do a continuous collection for a couple of

17  reasons, one of which is, you know, if you don't have

18  an end date it becomes unmanageable. And then, number

19  two, you know, it's a date where, you know, the

20  privilege logging usually gets tougher. But really

21  here the reason that we picked the date of the filing

22  of the application is we know that there was

23  significant relevant events that occurred during 2020

24  and I think that we'd be at a real risk of missing

25  relevant documents.

1                          PROCEEDINGS                    105

2              For example, a whistleblower came forward to

3    the VR respondents and made disclosures about the

4    fraud that had occurred. Those disclosures may well

5    have relevant evidence that could be deployed by

6    Nigeria in the English set aside trial. Another thing

7    that occurred and the English judge pointed to this in

8    his judgment of September 4, 2020, the English judge

9    pointed out the fact that the attempts by P&ID to

10   block the discovery we were seeking at that time in

11   the US from third party, that we were, that that was

12   evidence of the fraud. It was cited by the Court when

13   he granted permission to, for the English set aside

14   trial to go forward, and that occurred in the spring

15   and early summer of 2020.

16             So those are just some of the relevant events

17   during 2020. I think that it makes sense from that

18   factual standpoint and then also from the practical

19   standpoint of needing an end date and having it be the

20   start of this proceeding. Thank you.

21             THE COURT:  Mr. Chivers?

22             MR. CHIVERS:  Thank you, Your Honor.  The

23   events, the events that are relevant to the English

24   proceedings all occurred prior to January 31, 2017.

25   The only thing that Nigeria has pointed to is an

effort by P&ID to foreclose discovery in an unrelated
or in a different Section 1782 proceeding, I'm not
aware of why that would be a basis for discovery
beyond years after the award was rendered.

We I think really need to come back to the
timeline here. We're now talking about VR respondents
agreeing to do discovery for almost three years after
the award was rendered during which time there was
already substantial litigation related to the award.
And Nigeria wants us to continue reviewing documents
even from after when Nigeria filed the set aside
proceeding which prompted even more litigation and
more documents that contain the terms that they're
pointing to, but that do not have any unique relevant
information related to what happened in 2010 or before
2017.

They, I have not seen Nigeria put forward a
coherent rationale for why we should be going through
years of litigation documents that are years after the
award was rendered when there is no reason to believe
that the VR respondents would have unique relevant
documents about the procurement of the GSPA or the
procurement of the award. In our view, we are already
years beyond what would normally be allowed in civil

PROCEEDINGS                    107

litigation. The events here occurred ending in

January, 31, 2017, and we're already several years

after that, and Nigeria is asking us to review

basically litigation documents and it's extremely

burdensome to do so and they haven't connected the

dots as to why the VR respondents' emails from after

that time would contain unique, relevant and non-

privileged documents that relate to the procurement of

the GSPA or the procurement of the award.

         With respect to what Nigeria is calling a

whistleblower, I don't know if Your Honor has had an

opportunity to read that email, but Mr. McNaughton has

never had any affiliation or role with the VR

respondents. He sent an unsolicited email related to

events in, purported events in Nigeria that aren't

even related to the GSPA and certainly aren't related

to the award, and then he says I'm going to turn over

all the information I have to Nigeria's law

enforcement. And the email really underscores that

notwithstanding all the discovery that Nigeria has

done of people who have actual knowledge of what

happened in Nigeria in 2010 or what happened in the

English proceedings, they can't point to a single

document suggesting that the VR respondents have

```
 1                        PROCEEDINGS                    108
 2   unique and relevant documents when the VR respondents
 3   came in solely as an investor, and this is just a
 4   portfolio investment.
 5           So we think we've gone more than I've ever
 6   gone in a civil proceeding with respect to time period
 7   beyond the relevant events and Nigeria's request to go
 8   even further is not justified.
 9           THE COURT:  When you said there was the
10   whistleblower email, is that attached as an exhibit to
11   a document on ECF?
12           MR. CHIVERS:  I believe Nigeria is referring
13   to ECF 53-1, it was attached as exhibit A to their
14   letter. Mr. Major can correct me if I'm wrong.
15           MR. MAJOR:  I'm just going through my papers
16   here to make sure that that's correct.
17           MR. CHIVERS:  I apologize, it's 53-2.
18           THE COURT:  Yes, I see it.  And this Mr.
19   Bernard McNaughton, and who is that person?
20           MR. CHIVERS:  I don't know who this person is
21   beyond what is written in the email, but the email,
22   itself, describes events, I guess he says he was a
23   business associate of Cahill and Quinn before the
24   events relating to the GSPA and he was working with
25   them in Nigeria and he says that they're bad guys. And
```

PROCEEDINGS                         109

then Mr. Roshu Gradu (phonetic), one of the VR

respondents, responds by saying basically why are you

emailing this to me, we had no involvement with ICIL.

ICIL is the company that was, I think was, Mr. Quinn

had involvement in long before the GSPA, and Mr.

McNaughton responds by saying, you know, I'm going to

turn over all the information I have to Nigeria's law

enforcement which we think just underscores how far

afield this discovery has gotten. This is somebody

that says they're going to Nigeria to give them

evidence about things that didn't even relate to the

GSPA or the award and Nigeria is somehow pointing to

that as a reason to expand the time period into years

after the award.

          THE COURT:  Mr. Major, are the only two things

that Nigeria is pointing to for why it should get the

date range to go through the December 5, 2019, is the

whistleblower and the attempts by P&ID to block

discovery?

          MR. MAJOR:  No, Your Honor, I was just giving

those as examples of things that happened in 2020 that

would be completely omitted if we limited the date

range. But there's lots of other documents that may

well be available and that were, for example, emailed

PROCEEDINGS                    110

in 2020. Even if they were historical documents

attached to an email, if they were emailed to or

within the VR respondents during 2020 those documents

will be completely missed in the search that the VR

respondents are proposing to do.

        Just on Mr. McNaughton, he had originally come

forward and agreed to provide information, our clients

information, and one of the things that they're

looking into, he received some payments from a source

that I believe is still being traced, but he had

received some payments and then no longer came

forward. And so one of the things our client is

looking into for the English trial is whether he was

paid any hush money, so to speak.

        And, you know, the fact that counsel for the

VR respondents keeps saying that it shouldn't matter

what happened after the, his client came in and

purchased and interest in the award, first of all,

this is an argument that was raised and rejected by

the Court when the Court ordered the Section 1782

discovery, this is something the VR respondents have

been arguing for a very long time.

        The obviously acknowledge that as part of the

order they have to produce documents.  There may well

1
2  be, you know, new issues that occurred during 2020,
3  but even if not, and I've already identified a couple
4  for the Court, but, you know, the other thing about
5  2020, as I said, they could be emailing documents that
6  attach, sending emails or receiving emails that attach
7  documents that are relevant to the English trial and
8  that's why they're getting picked up in the hit count.
9  I recognize that there probably are privilege
10  documents during that period but those documents can
11  be addressed, you know, by counsel pulling them out
12  and not producing them, obviously. And if there are
13  burden issues associated with that, then, you know,
14  that's something that we've already explained to them
15  that we're willing to do some reasonable things to
16  make sure that, you know, they're not spending too
17  much time just looking at privilege documents.
18          But there are going to be documents that get
19  missed related to Mr. McNaughton, related to things
20  that were done during 2020 to try to block discovery
21  by P&ID, including the third party financial firm
22  discovery we were taking here in New York. And so I
23  think that the time period picking the beginning of
24  2021 when this proceeding was filed is a logical place
25  to cut it off.  Obviously, there is, you know, there

PROCEEDINGS                    112

has to be a place that we pick but I think that at
least bringing it out to that period, I mean in terms
of the litigation that was going on, Nigeria didn't
even have permission to pursue the set aside trial
until September 4th of 2020. So certainly trying to cut
it off when they filed an application for permission a
year earlier I think is going to definitely cause us
to miss documents.

          I mean this McNaughton issue is not an
unserious issue. If you look at the top of that
exhibit it goes to Mr. Deitz. So it's obviously an
important issue for the VR respondents and they may
have documents in their possession that they didn't
create from 2020 that I think should be reviewed and
to the extent not privileged produced.

          THE COURT:  Can I ask if either party -- what
was the date range that was agreed upon before Judge
Engelmayer in that proceeding?

          MR. MAJOR:  From the respondents' point of
view, what's happened in that proceeding so far is the
VR respondents, and Mr. Kim who is on the line can
probably be more precise here but just conceptually,
what the VR respondents did was they did a varied
search were some of the search terms I believe went

1
2   for a longer period. And but that was selected by

3   them, we did not reach an agreement of what to do in

4   that proceeding, and they did, you know, the VR

5   respondents did that unilateral search where they kind

6   of designed it and proposed it and that was when Judge

7   Engelmayer said, well since you've already, you know,

8   done that collection, do the review and production and

9   then also he ordered them to run the search terms that

10  we had proposed at the time. And so I don't know, Mr.

11  Kim, if you could give the, more precision on what

12  those actual dates were?

13         MR. KIM:  Sure, Your Honor, this is Austin Kim

14  for the respondents. And so the date range that had

15  been selected and this, again, was a date range

16  selected by the VR respondents that they decided to

17  run, was for, there were two sets of date ranges. One

18  was for the individual custodians and that date range

19  was January 1, 2006, to October 30, 2021, and then for

20  the network drive, which is sort of the shared drive

21  that we've been discussing on this call, for that date

22  range it was January 1, 2017, through the same,

23  October 30, 2021.

24         THE COURT:  So in Engelmayer's proceeding

25  you're getting more, you're getting through October of

```
 1                        PROCEEDINGS            114
 2   2021.  Here the cutoff is December 5th of 2019, right?
 3             MR. KIM: That's the proposed timeline that the
 4   VR respondents have now rolled it back to, that's
 5   correct, Your Honor.
 6             MR. CHIVERS:  Your Honor --
 7             THE COURT:  Sure, oh, sorry, is this Mr.
 8   Chivers?
 9             MR. CHIVERS:  Yes, Your Honor.
10             THE COURT:  Go ahead.
11             MR. CHIVERS:  For the VR respondents there
12   hasn't been a rollback, the proceedings before Judge
13   Engelmayer and then Judge Schofield have fairly
14   nuanced procedural history and the, first of all, with
15   respect to the search terms that were run in that
16   case, the VR respondents applied the search terms that
17   Nigeria and P&ID reached in the English proceedings
18   that would apply to documents then received after July
19   1, 2017.  The VR respondents continued to claim that
20   we selected those unilaterally but we didn't just make
21   up those search terms, those were terms that were
22   agreed upon in the English proceedings. And with
23   respect to the time period, what really happened there
24   is that Judge Engelmayer wanted the parties to do
25   discovery because that case had been pending for so
```

long and their impasse had been for so long, and I

think the VR respondents basically threw up their

hands and said, okay, here, we'll do this discovery

based on the English proceeding search terms and they

ran it through a very overbroad time period through

October, 2021.

        One of the insights from that is that running

the search terms through that period is what brings up

just enormous volume of litigation documents, at that

point there's four or five litigations going on and no

reason to believe and that review and production is

done and I don't believe that the, that Nigeria has

pointed to any documents from that review and

production which was more than 100,000 documents

reviewed, that would lead anybody to believe that we

should continue reviewing documents form years after

the award. I think, if anything, expanding the time

period in that case just underscores that this is an

enormous net that they're trying to cast that has no

relation to the underlying timeline.

        The agreement is memorialized on the docket,

it's at 20mc209 at ECF number 48-2 where there's an

email from the VR respondents' prior counsel

explaining why they used those search terms in the VR,

```
 1                        PROCEEDINGS              116
 2   in that proceeding, which is that were reached in the
 3   English proceeding.
 4          THE COURT:  But I guess I might be missing
 5   something.  If the VR respondents agreed to produce or
 6   to search for documents through October of 2021 in the
 7   related Engelmayer, the proceeding before Judge
 8   Engelmayer, I'm struggling to see why in this
 9   proceeding raising, you know, all based off of similar
10   underlying facts, the cutoff is now December of 2019?
11          MR. CHIVERS:  Well, Your Honor, the experience
12   from reviewing documents form later is that there
13   aren't any unique and relevant documents. We've
14   reviewed them and produced from them and the burden
15   has been enormous.  I certainly don't think that the
16   agreement that was reached in the Schofield proceeding
17   should be some kind of precedent that was reached as a
18   matter of compromise because the VR respondents were
19   trying to just over produce and over review as a way
20   to, you know, just get through that proceeding.  And
21   we'll go before Judge Schofield at some point to
22   discuss what, if any, additional discovery should be
23   done there, but certainly I don't see how that could
24   be a precedent for this action.
25              This action is also narrower, significantly
```

2  narrower. This action relates to the English

3  proceedings whereas in the Schofield proceeding,

4  Nigeria is seeking documents related to a broader

5  universe of events.  I mean in the Schofield

6  proceeding Nigeria was seeking documents and may still

7  be seeking documents related to the enforcement of the

8  award which the only reason I can think of that the

9  time period would go beyond, would go beyond something

10 like 2018 or 2019. Whereas in this case, the English

11 proceedings are the anchor against which we need to

12 evaluate relevance and proportionality and the events

13 that are relevant to the English proceeding occurred

14 in 2010, 2011, through 2017.

15         THE COURT:  But isn't this the same date range

16 you're using in the Engelmayer proceeding which

17 concerns the pending Nigerian criminal proceeding?

18         MR. CHIVERS:  We, so in the Schofield

19 proceeding, the current status is that the VR

20 respondents agreed to perform certain discovery, they

21 performed that discovery and they completed that

22 discovery, and the position they're taking in the

23 Schofield proceeding is that no further discovery

24 should be done.  And I think, Your Honor, the position

25 by Nigeria for the entirety of these litigations is

PROCEEDINGS                    118

that these cases need to be viewed distinctly. I think

that was their primary opposition to the VR

respondents' arguments related to res judicata or

claim preclusion or seeking to get the cases

consolidated.  Nigeria has time and again said these

cases need to be evaluated and analyzed separately and

now I hear them to be sort of saying like, well,

because the VR respondents made an agreement in the

other case based on reasons that are unique to that

other case, that should be some kind of precedent

here. I don't think that's appropriate, especially

given the arguments Nigeria has made about keeping

these things separate.

MR. KIM:  Your Honor, this is Austin Kim

again, I just have a couple of clarifying points, you

know, because the few times that Mr. Chivers mentioned

negotiate or compromise or some sort of precedent and

that's just false, Your Honor. There was no

negotiation or compromise, this was an edict from VR

respondents that this is what we're going to do, if

you don't like it then go complain to the judge, and

that's exactly what happened.

The October 31, 2021, date was selected by the

VR respondents without asking Nigeria a single

PROCEEDINGS                    119

question and they told us that that was based on the
English proceedings. So the October, 2021, date that
was used, the VR respondents represented to us that
that was based on what was considered relevant in the
English proceedings.  Now we're hearing that the
October, 2021, date has no connection to the English
proceedings.

Also, with regards to the 100,000 document
number that's being thrown around, the actual
production from the Engelmayer proceeding or Judge
Schofield proceeding is about 1,200. And so after --
after figuring out which date range they wanted to us
and then picking 33, I believe it was 33 or 34 search
terms out of the 150 that were agreed to in the
English proceeding, so they cut out about 75 percent
of the search terms, picked 33 of the ones they liked
with their search terms, their date range and then
produced 1,200 documents. So it's no surprise that a
smoking gun didn't appear.

So I just wanted to clarify those points as to
how we got to where we got in the Judge Schofield
proceeding.

THE COURT:  So I might be missing something
and someone should speak up if I am, but this is where

1

2   I'm not following. In the related proceeding before

3   Judge Engelmayer, what I've heard Nigeria say is that

4   the VR respondents agreed to produce documents through

5   October of 2021 because presumably they thought, or at

6   least agreed that there were relevant documents to the

7   English proceeding up to that date. And what Nigeria

8   wants here is a cutoff earlier than that, right,

9   January of 2021, several months earlier. And now --

10  I'm sorry, now I hear -- sorry, Mr. Kim?

11          MR. MAJOR:  No, sorry, this is Chris Major,

12  Your Honor, I apologize. The earlier time period that

13  we're proposing is a compromise. In other words --

14          THE COURT:  Yes, I totally get that one.  So I

15  guess my confusion -- no, I don't mean to cut you off,

16  but just to make clear what my confusion is, is I

17  don't understand how in one proceeding that everyone

18  agrees is related where the VR respondents have said

19  that there's documents through October of 2021 that

20  are relevant to the English proceeding, the English

21  proceeding being key in our current proceeding here,

22  how now it can be the case that we're saying, no, the

23  documents end at December of 2019.

24          MR. CHIVERS:  Your Honor, this is Jeff Chivers

25  for the VR respondents, the VR respondents have not

PROCEEDINGS                    121

made that concession. I would ask that counsel for the

other side point to that concession about relevance. I

am not aware of any such concession by the VR

respondents. That is the --

THE COURT:  You agreed to produce the

documents, isn't it, even if you didn't, even if you

didn't expressly make the concession you implicitly

made the concession when you agreed to the production

through that date.

MR. CHIVERS:  No, I don't -- no, Your Honor,

and the Engelmayer transcript is crucial on this.  The

VR respondents expressly reserved their rights to

argue relevance and burden after that hearing before

Judge Engelmayer. And what they agreed to do there was

not, I mean it was explicitly said that it was not a

concession.  For Nigeria to now say that was a

concession that should be used as some sort of

precedent for this proceeding I believe goes directly

against what was presented to Judge Engelmayer.

Mr. Kim also accused me also I think of making

a false statement which I believe is a bit out of

line. It is, it is not true that the VR respondents

just unilaterally chose search terms or cut off 75

percent of search terms. The search terms that were

agreed upon in the English proceeding had date ranges.
There was a segment of the search terms that applied
to one date range and a segment of the search terms
that applied to a different date range.  The VR
respondents -- the VR respondents applied the search
terms that applied to the date range for which the VR
respondents were involved in making the investment.
This was not some kind of decision, I mean I think Mr.
Kim's statements had several accusations embedded in
them as if we are, you know, reviewing documents and
then gaming things to try to avoid the production of
things. There is absolutely no evidence of that, I
think it's getting very close to a line with respect
to being improper with respect to how they say we're
handling this. There's no evidence that we've been
handling this in a way that is anything other than
above board.

          MR. KIM:  I apologize, I didn't mean to be
adversarial on this. But, for example, in the related
proceeding the term P&ID was excluded, Process and
Industrial was excluded, GSPA was excluded, gas supply
and processing agreement was also excluded. So I mean
it may have been, you know, some sort of formula they
came up with but it seems, it seems difficult to

```
 1                        PROCEEDINGS              123
 2  square how the term P&ID was properly excluded from a
 3  search in aid of investigations concerning P&ID's
 4  fraud.  But that's all I have to say on that.
 5            MR. MAJOR:  Again, Your Honor, the search
 6  terms were based upon the search terms for the time
 7  period as agreed in the English proceedings, this was
 8  not a selective exclusion or anything like that. And
 9  in this proceeding, with respect to the five
10  custodians we've agreed to produce for the time period
11  that we've agreed to produce, we've used all of the
12  search terms that Nigeria asked for.
13            THE COURT:  Okay.  So let me, just to recap
14  before, I owe you a decision on the first issue that
15  we first started discussing, the financial documents
16  of valuation. I will owe you a decision on the second
17  category once I get the documents for in camera
18  review.  I'm, we're going to wait to hear back from
19  Mr. Chivers on the du Toit and Deitz search count, the
20  hit report with the reduced search terms.  I'm going
21  to just, since I owe you a decision on the first, I
22  will give you the date range decision along with the
23  first category.
24            I think the only remaining issue is the
25  depositions, unless I'm missing something?
```

```
 1
 2          MR. MAJOR:  That's correct, Your Honor.
 3          MR. CHIVERS:  Jeff Chivers for the
 4 respondents. I believe Your Honor ruled from the bench
 5 that the scope of disclosure does not extend to the
 6 lobbying or public media documents.
 7          THE COURT:  Yes.  Yes, I didn't mean to leave
 8 that one out, that's correct.  So the decision, what
 9 you're going to hear from me on is the first category,
10 the second category and the date range. We're tabling
11 the custodian issue until we see the hit count and now
12 we're left with the deposition issue.
13          MR. KIM:  That's correct, Your Honor,
14 deposition are the last remaining issue for today.
15          THE COURT:  Okay, and what's the deposition
16 issue?
17          MR. KIM:  Well the deposition is that we'd
18 like to take the deposition of the two individual
19 custodians -- the individual respondents, Ashok Raju
20 and Jeffrey Johnson and also the corporate
21 representative deposition for the VR respondents.  And
22 we've previewed this issue with Mr. Chivers before
23 and, you know, and I think it was alluded to in his
24 response letter, is what we would like is for the
25 Court to order the depositions to occur within the
```

PROCEEDINGS                    125

time frame of the existing disclosure which would be

by November 30th of this year.

            THE COURT:  So --

            MR. KIM:  And with regard to the scope of the

depositions, and this is something I've also discussed

with Mr. Chivers, is that the parties, Nigeria and VR

respondents have entered into extensive negotiations

with regard to the criteria, production and the topics

that are relevant. And with the exception of the first

two issues that are still under consideration by Your

Honor, which would be the investment criteria and the

second category that Your Honor reserved decision on,

the rest of the topics have also been agreed to as

relevant within the scope. So we're just looking for

Your Honor to provide some clarity on when the

depositions will occur.

            THE COURT:  Well let me just ask you, we're

still also waiting for the hit counts on the two

additional custodians, and I guess depending on that

I'm just trying to get a sense of whether it's

feasible to have everything done by November 30th. Mr.

Chivers?

            MR. CHIVERS:  Thanks, Your Honor.  With

respect to the scope of the deposition, our request is

that Nigeria serve a document that lays out the topics

that it wants to depose on. I think it's true, we've

had meet and confer sessions, but we don't have that

document and that document is really important to

going to the client and being the source of truth with

what the depositions are about. And we've said we

will, we will respond to that once we get that

document.

So with respect to time period, this is,

there's a lot of work on our plates already. I think

coming out of this hearing there's additional work

beyond what was already on our plate, and I don't

think it's realistic to have all the document

discovery and all the depositions done by November

30th. I think if the current scope of discovery were

all that we were doing with respect to document

discovery, we may be able to, you know, pull weekends

and nights to get even the depositions done by

November 30th, but Nigeria is asking for more document

discovery on the one hand and then asking for an

expedited deposition schedule on the other hand.  I

think it would be extremely difficult, I don't think

it's feasible to expect us to do all of this document

discovery and then also prepare for depositions by

```
 1                       PROCEEDINGS                  127
 2   November 30th.  It could be soon after that, you know,
 3   a couple of weeks after that, I understand they have a
 4   deadline, but November 30th is a really tough date.
 5             THE COURT:  Mr. Kim, has Nigeria not served
 6   the list of deposition topics?
 7             MR. KIM:  Well what I've discussed with Mr.
 8   Chivers is that a list of deposition topics -- the
 9   list of deposition topics is going to mirror the list
10   and criteria of production that we've already
11   discussed and negotiated over the past several weeks.
12   So I mean I think it's no surprise and Mr. Chivers has
13   already identified for us who the likely corporate
14   representative is going to be.  We're in agreement on
15   the topics, it's not, there's no mystery and we're not
16   hiding the ball here, but the formal document has not
17   been sent to them, that's correct, Your Honor. But the
18   topics is not, I don't believe the topics or the
19   mystery around topics should be a reason for a delay.
20             The only outstanding potential issues with the
21   topics would be pending Your Honor's decision on the
22   outstanding issues of scope.
23             THE COURT:  Right.  Okay, so -- what is this,
24   November 1st.  So I think it would make sense to have
25   Nigeria formally serve deposition topics just so that
```

1

2  there's no ambiguity or uncertainty as to, I

3  understand the parties have negotiated whatever the

4  scope of discovery was but, you know, just to make

5  sure we're proceeding in order I would have Nigeria

6  serve the deposition topics. Because we're talking

7  about potentially expanding the scope of the

8  responsive documents either through potentially a

9  ruling on the first or second category or the

10 custodian issue, I'm not inclined to say November 30th

11 is the deadline for having the deposition taken.  I'm,

12 instead of me setting an arbitrary deadline, now that

13 I've said that, you know, I'm not going to force VR

14 respondents to get it all done by November 30th, if the

15 parties want to meet and confer and figure out a

16 reasonably good date that works for both sides, I

17 think that would probably be better for you than me

18 just arbitrarily picking a date. But if the parties

19 can't agree, I can certainly pick a date.

20          MR. KIM:  Your Honor, just to, I think that,

21 you know, Mr. Chivers is joining the party a little

22 bit on the late side but, you know, this proceeding

23 was filed, what, January of 2021, and when we filed

24 the proceeding we served subpoenas, deposition

25 subpoenas on the VR respondents that did include all

2    of our document requests. So the scope has now since

3    then been narrowed significantly to where we are today

4    and so, you know, at a minimum we would ask that, at a

5    minimum that VR respondents would agree to the two

6    individual respondents being deposed, as well as the

7    corporate representative, and then we can meet and

8    confer as to the number of corporate representatives,

9    whether it's one for all of them, or each one wants to

10   appoint their own, that's something that we can

11   discuss.  But then we can then, as Your Honor

12   instructed, confer as to reasonable time by which the

13   depositions would be completed by, from our

14   perspective because we have a January trial date, we

15   don't really have much wiggle room to be able to

16   obtain deposition testimony in time to be used in the

17   English trial.

18          THE COURT:  So here's the problem with pushing

19   the January 1st trial deadline.  When I inherited Judge

20   Freeman's docket, I knew this had been outstanding for

21   a while, and I think sometime in May I had issued an

22   order for an oral argument on this and when I tried to

23   like get this case resolved sooner, the parties I

24   think twice asked for an adjournment of a decision

25   because they wanted to proceed before Judge

1                           PROCEEDINGS                    130

2   Engelmayer. And then eventually when that didn't work

3   out everyone came back.  But I guess, you know, if

4   urgency was such an issue, I, you know, I struggle to

5   understand why when in May I was ready to rule on this

6   and have an oral argument the parties were like let's

7   adjourn and see what happens before Judge Engelmayer.

8           So I understand that Nigeria has a deadline of

9   January for the trial, but, you know, given the scope

10  of the production and the additional discovery that

11  Nigeria wants, I'm just not, I'm not going to force

12  the depositions to also occur by November 30th and

13  force VR respondents to operate on that schedule given

14  that, you know, I understand before I came on that it

15  was, you know, Judge Freeman didn't give you a

16  decision soon enough on the case language, but when I

17  did inherit her case I did try to get this moving and

18  no one wanted to move quickly at that point.

19          MR. KIM:  Understood, Your Honor, that's fair

20  and we don't want to impose any burden on the Court.

21  The decision at the time that was made was, I mean

22  frankly speaking, Nigeria was acting in good faith and

23  we had expected that the collection would proceed in a

24  prompt manner, but it took, it took the VR respondents

25  four months to produce 1,200 documents.  And so, and

1
2  after that four month period had pretty much come to
3  an end, we realized that, you know, that they were
4  just buying time, and so that's when we declined the
5  VR respondents' third request for an adjournment.
6  Because the requests were VR respondents' requests and
7  we complied because they were in the middle of
8  production and then it turns out that their grand
9  production of 1,2000 took them 4 months and at that
10 point that's when we acted.

11        But I totally appreciate that Your Honor, you
12 know, is not the one who asked for the adjournments
13 and so we'll comply with whatever Your Honor says.

14        THE COURT:  Okay, so just to make sure we have
15 a timeline that works here, Mr. Kim, you had indicated
16 you wanted VR respondents to identify the people who
17 would be deposed, I'm not sure if I'm summarizing that
18 accurately, but if I'm not you should let me know. But
19 I don't think I saw in your letter exactly who the two
20 individuals you wanted were?

21        MR. KIM:  Oh, it's just the individual
22 respondents, that would be Ashok Raju and Jeffrey
23 Johnson and those are the two individual respondents
24 that are part of this proceeding, and then a corporate
25 representative. And then I'm sure that Mr. Chivers and

PROCEEDINGS                    132

1

2   I with Mr. Major can consult with our clients and

3   decide whether we want one corporate representative or

4   four. That's something that we can determine.  But

5   it's just the idea of ordering that the respondents be

6   deposed and then after this call Mr. Chivers and I can

7   offline discuss the reasonable time by which the

8   deposition will be done, I just don't have a time off

9   the top of my head that I can throw out there for

10  consideration.

11         THE COURT:  Okay, no, that's fine.  Mr.

12  Chivers, what is the problem with having the

13  individual respondents deposed?

14         MR. CHIVERS:  Well, Your Honor, the last time

15  that depositions was discussed between counsel, I

16  don't believe we talked about the individual

17  respondents, I think they would say, well, we served

18  the subpoenas so you should have known that and,

19  nonetheless, we didn't discuss it. I think with

20  respect to the corporate representative we're waiting

21  for the notice with respect to the list of topics.

22         With respect to the two individuals, I think

23  we may have a dispute there because we've included

24  them as custodians because they were named in the

25  subpoenas and we are reviewing and we're going to

produce non-privileged relevant documents. But I don't

think Nigeria has given an actual reason that these

two individuals would have anything, I didn't expect

this to come up on the hearing today, but I'm not

aware of a reason that Nigeria actually wants to

depose these two people. And I think we'd at least

like to hear that before agreeing to have the former

and current chief operating officers sit down and I

think we'd want to discuss with Nigeria's counsel what

the time limitations would be for that, whether they'd

be in person or remote. It's a substantial burden to

have executives sit down for a deposition like this

and we're not seeing any reason that these two should

have to sit down based upon what Nigeria has put

forward.

        With respect to the corporate representative,

yes, we will make a corporate representative, one or

more corporate representatives available for the

deposition as soon as we get the list of topics. And

we're not trying to drag our feet on that at all.

        THE COURT:  Okay, so then since, so it sounds

like VR respondents are agreeing to the corporate

representatives, the parties are going to have to meet

and confer anyway on the timing issue, and Nigeria is

1

2  going to formally serve the list of deposition topics.

3  Mr. Kim, I think it might make sense given what Mr.

4  Chivers said for the parties to just meet and confer

5  entirely and discuss the deposition of the individual

6  respondents and explaining why the depositions are

7  necessary.

8         MR. KIM:  That's fine, Your Honor, we will do

9  that. As soon as this call is over I will connect with

10  Mr. Chivers and we can set up a meet and confer.

11  Judge, just briefly, Mr. Raju is the primary contact

12  person at VR respondents.  For example, the

13  whistleblower sent a general email to VR respondents'

14  mailbox and that automatically was sent to Ashok Raju

15  who is one of the individual respondents. So he is the

16  face, for all intents and purposes, of all

17  communications that are sent to VR respondents.

18         With respect to Jeffrey Johnson, he's a

19  director, he's not only an executive of VR

20  respondents, his exact title escapes me right now, but

21  he's also a director of PHL. And so he is definitely

22  somebody who is not tangentially involved, he is

23  directly involved in the investment with VR

24  respondents' investment in P&ID from the very

25  beginning. So he would be also somebody who would have

PROCEEDINGS                    135

relevant information that Nigeria is seeking for the

English proceedings. But these are topics I'll discuss

with Mr. Chivers offline and then we can send a joint

letter to Your Honor, today is Tuesday, if Your Honor

would be amenable to it we can send something in by

Thursday just so your Court has the, Your Honor has

the information while you're considering the other

outstanding issues.

THE COURT:  Yes, so what I'll say is I'm happy

to rule on these things quickly, so to the extent you

meet and confer and the dates of the depositions and

the individual respondents is still an issue, if you

send me a letter I won't sit on it for long, I'll try

to give you a decision really quickly.  So I think

that might make the most sense given that it sounds

like for Mr. Chivers he wasn't really prepared to

address this issue. And I don't mean to suggest, Mr.

Chivers, that it was through any fault of your own,

but I'd like to have the parties just meet and confer

first before having me decide it.

MR. CHIVERS:  Thank you, Your Honor.

MR. KIM: Go ahead, I'm sorry.

MR. CHIVERS:  I think attempting to resolve

this before Thursday between the parties is overly

```
 1                      PROCEEDINGS              136
 2  ambitious, there's several things I have to do
 3  immediately coming out of this conference and I think
 4  we could submit a joint letter on this, if one is even
 5  needed, because, again, I think this issue hasn't been
 6  sufficiently developed and we may be able to reach
 7  agreement on this and if a joint letter is needed I
 8  think we could submit it early next week and it would
 9  still be timely with respect to the overall timeline.
10           THE COURT:  If you can, if you can submit it
11  by the time you're submitting the second category, the
12  November 7th review, we could take care of it all
13  together.
14           MR. CHIVERS:  Understood, Your Honor, we can
15  do that.
16           THE COURT:  Okay, I think that might address
17  every issue that was raised in the letters, if there
18  is anything I missed, folks should let me know now?
19  Okay --
20           MR. KIM: For Nigeria, I think we've covered
21  all the grounds, Your Honor. Thank you for the time.
22           THE COURT:  Great, and then Mr. Chivers?
23           MR. CHIVERS:  I think that's everything, Your
24  Honor, thank you.
25           THE COURT:  Okay, so I've already summarized
```

```
 1                        PROCEEDINGS              137
 2   what you need form me and I'll get that out quickly,
 3   and I really appreciate everyone taking all this time
 4   to discuss these issues. And to the extent possible,
 5   if one of the parties can order the transcript that
 6   would be very helpful.
 7            MR. MAJOR:  Will do, thank you very much for
 8   all the time, Your Honor, really appreciate it.
 9            MR. CHIVERS:  Thank you, Your Honor.
10               (Whereupon, the matter is adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

138

## C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of The Federal Republic of Nigeria versus VR Advisory Services, LTD, et al., Docket #21mc00007, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature  _____
           *Carole Ludwig*

           Carole Ludwig

Date:    November 7, 2022